· 30   231
60   586

## THE BRIDGEPORT BANK *vs.* THE NEW YORK & NEW HAVEN RAILROAD COMPANY.

The plaintiffs in  May, 1849, received from R. & G. L. Schuyler, as  collateral security for  money advanced, certificates of  90 shares of the stock of  the New York & N. Haven R. R. Co., of  which R. Schuyler  was transfer agent.  The certificates  had shortly before been issued by Schuyler, as transfer agent, to the firm.   At this time the capital stock of  the company was fixed by its  charter at $2,500,000, which  had all  been taken and paid in.  In July, 1854, it was dis-

covered that Schuyler had fraudulently issued to the firm certificates of stock to a very large amount beyond the capital limited by the charter, of which 480 shares had been issued prior to the issuing of the certificates held by the plaintiffs, but there was no evidence that any of this spurious stock had at that time passed out of the hands of the firm. The firm owned at the time of the delivery of the certificates to the plaintiffs 160 shares of genuine stock. The certificates were accompanied on the same paper by a printed form of assignment and power of attorney, which were executed by Schuyler in the name of the firm under seal, but were left in blank as to the names of the transferee and attorney. These instruments were in the form prescribed by the directors and which had from the first been in use. A by-law of the company provided that all transfers of stock should be made on the books of the company at the office of the transfer agent, and that no transfers should be allowed except upon a surrender of the certificate held by the party making the transfer, and this appeared upon the face of the certificate. Of the 480 shares over-issued at the time the plaintiffs took their certificates, the certificates of over 350 were within the next two years surrendered by the firm and the stock which they purported to represent transferred on the books of the company to other parties. The plaintiffs held their certificates without calling for a transfer of the stock, and without giving notice to the company, until after the discovery of the fraud of Schuyler in July, 1854, when they made demand on the company to be allowed to transfer the stock to themselves under the power of attorney. The company refusing, they brought an action on the case for damages. Held:—

1. That the 90 shares would be presumed to be a part of the 160 genuine shares owned at the time by the firm, in the absence of proof on the part of the defendants to the contrary.

2. That, regarding the stock as genuine, the plaintiffs had not lost their right to it, and their right to a transfer of it on the books of the company, by the transfers to a greater amount than the 160 genuine shares made by the Schuylers to other parties on the books of the company, the defendants having by their own by-laws, and by the conditions of their certificates, no right to allow the stock to be transferred except upon a surrender of the certificates.

3. That the allowing of the transfer of the stock to other parties on the books of the company was a fraud of the transfer agent of which the defendants could not take advantage, since the agent was acting within the scope of his official power, and with full knowledge that the stock was owned by the plaintiffs and that their certificate was outstanding, which knowledge possessed by the transfer agent while he was acting officially was the knowledge of the company.

4. That the blank assignment and power of attorney, though under seal, could be filled up at the convenience of the plaintiffs, and when so filled up operated as of their date.

5. That it was sufficient for this purpose that such was the law of New York, even though the assignment and power of attorney were executed in Connecticut, since the transfer of the stock was to be made in New York.

Such a certificate, accompanied by an assignment and power of attorney executed in blank, may perhaps be regarded as having a species of negotiability, though of a peculiar character; and it is no objection to such negotiability that the assignment and power of attorney are under seal.

The plaintiffs made a demand on the company to be allowed to transfer the stocks

to themselves, on the day following the discovery of the fraud of Schuyler. At this time the affairs of the company owing to this fraud were in great confusion, and it was impossible without a long investigation to distinguish the spurious stock from the genuine. The transfer books were closed, and no transfer agent had been appointed in the place of Schuyler who had absconded. One of the directors, to whom the plaintiffs applied at the office of the company, in reply to the demand, informed them that the transfer books had been closed and that no transfers could be allowed. There was no refusal to allow the transfer at some future time. Held, that in the circumstances the company were justified in refusing to allow the transfer, and that the demand was not a sufficient one to put the company in default.

The plaintiffs made another demand five years afterwards, through one *B*, an attorney at law of the city of New York, who had made an agreement with the plaintiffs to bring and conduct the present suit for them at his own expense and risk, for a certain share of the amount actually recovered, and the demand was made under the agreement for the purpose of bringing the suit. During the trial, the fact of this agreement having been brought by the defendants to the notice of the court, the parties rescinded it. Held, that the unlawfulness of the agreement did not make the demand an insufficient one, the question being purely one of authority on the part of *B* to act for the plaintiffs.

ACTION on the case, for the refusal of the defendants to allow a transfer of ninety shares of the stock of the defendants to be made to the plaintiffs on the transfer book of the defendants, claiming as damages the value of the stock.

The case was tried in the superior court on the general issue, with notice, closed to the court, and the following facts were specially found.

The plaintiffs, a banking corporation located in Bridgeport in this state, about the 1st of May, 1849, received from the firm of R. & G. L. Schuyler of the city of New York, two certificates of stock of the defendants' company, one for forty and the other for fifty shares, as collateral security for advances made and agreed to be made to the firm; and from that time until the 23d of June, 1854, the plaintiffs made from time to time large advances to the firm, amounting in the whole to nearly $200,000, and on which, on the 23d of June, 1854, there was a balance of $7,000 due to the plaintiffs from the firm, which has never been paid. The certificates were accompanied, upon the same paper, by an assignment and power of attorney, signed and sealed by the said R. & G. L.

Schuyler, and filled up except as to the names of the transferee and attorney, which were left in blank. These instruments were as follows:—

"NEW YORK AND NEW HAVEN RAILROAD COMPANY.

No. 890.

"*Capital* $2,500,000.    *New York Office.    Shares* $100 *each.*

"Be it known that R. & G. L. Schuyler of New York are entitled to forty shares of the capital stock of the New York and New Haven Railroad Company, transferable on the books of the company, at its office in the city of New York, by the said R. & G. L. Schuyler, or their attorney, on the surrender of this certificate.    New York, March 23d, 1849.

ROBERT SCHUYLER, *Transfer Agent."*

"KNOW ALL MEN BY THESE PRESENTS, That we, R. & G. L. Schuyler of New York, for value received, have bargained, sold, assigned and transferred, and by these presents do bargain, sell, assign and transfer unto                of                forty shares in the capital stock of the New York and New Haven Railroad Company, standing in our name on the books of said company, and transferable only at its office in the city of New York.    And we do hereby constitute and appoint                our true and lawful attorney, irrevocable, for us and in our name and stead but to        use, to sell, assign, transfer and set over, all or any part of the said stock ; and for that purpose to make and execute all necessary acts of assignment and transfer, and one or more persons to substitute with like full power, hereby ratifying and confirming all that our said attorney or his substitute or substitutes shall lawfully do by virtue hereof.    In witness whereof we hereunto set our hand and seal the 31st day of March, 1849.            R. & G. L. SCHUYLER, (Seal.)"

The other certificate, with the accompanying assignment and power of attorney, were in the same form, the certificate being numbered 922, and being for fifty shares, and bearing date March 30, 1849, the assignment and power of attorney being signed and sealed in the same manner, and dated March 31st, 1849.    The blanks in these instruments were not filled until the trial, during which the names of the plaintiffs were

inserted by their counsel.  The certificates and the accompanying assignments and powers of attorney were in the precise form prescribed by the directors of the railroad company, and which had from the first been in use.  The certificates were issued by Schuyler to his firm at the time they bare date, but were not assigned to the plaintiffs until about the first of May following.

At the time when these certificates bare date and from that time down to the 3d day of July, 1854, Robert Schuyler, the principal member of the firm of R. & G. L. Schuyler, was the president of the defendants' company, one of its directors, and its transfer agent in the city of New York.  On the 3d of July, 1854, he absconded, and it was discovered that for several years before he had from time to time issued fraudulent certificates of stock in the company to the firm of which he was a member, which had been used by him in the name of the firm for the purpose of raising money thereon as collateral security for his own private use and for that of the firm.  This spurious stock had by frequent transfers, fraudulently allowed by Schuyler as transfer agent of the company, become confused with the genuine stock of the company, so that it was at that time impossible to distinguish between them.  The whole amount of fraudulent certificates thus issued was 17,752 shares. This fraud was entirely unknown to the directors of the company until disclosed by Schuyler himself, by a communication to the directors when he left the country.

By the charter of the company, granted in 1844, the capital stock of the company was fixed at $2,000,000, with the privilege on the part of the company of increasing it to $3,000,000, the stock being divided into shares of $100 each.  In November, 1846, the capital, by proper proceedings on the part of the company, was increased to the sum of $2,500,000, or 2,500 shares, at which it stood at the time when the certificates held by the plaintiffs were issued and at the time when the same were assigned to them by R. & G. L. Schuyler, and the whole capital thus increased had been paid in; and in August, 1851, it was by like proceedings increased to the sum of $3,000,000, or 30,000 shares, all of which was paid

in. The 17,752 shares found to have been fraudulently issued by Schuyler, were an excess of that number of shares above the 30,000 shares, to which the capital was limited by the charter.

Soon after the organization of the defendants as a corporation, the directors adopted, under authority of the charter, which gave them power to make by-laws, the following regulations with regard to the transfers and certificates of stock :—

" The principal transfer office shall be in the city of New Haven, but transfer agencies may be established in the cities of New York and Boston, by resolution of the board of directors; and all transfers of stock at any office shall be made under and in compliance with such rules and regulations, and by such instrument of assignment and transfer (which need not be under seal,) as may, from time to time, be made, ordered and appointed by the board of directors. Certificates of stock shall be in such form, and issued under such rules and regulations, as the board of directors may from time to time appoint and direct; but when a certificate of stock has been issued to any stockholder, no second or duplicate certificate shall be issued, and no transfer of the stock shall thereafter be made or permitted without the surrender of said certificate, unless the same shall be lost or mislaid, and then only on special resolution of the board of directors, and compliance with the rules and regulations, conditions and stipulations, as to the renewal of certificates lost or mislaid, which may be adopted, imposed and required from time to time by the board of directors."

And the directors afterwards adopted the following further by-laws with regard to the transfers of stock, all of which, as well as the foregoing, were in force at the time of the issuing of the certificates held by the plaintiffs, and have ever since continued in force.

" 1. All transfers of stock at any of the offices of the company shall be made in the transfer books of the office at which the stock proposed to be transferred shall stand to the credit of the party to make the transfer.

" 2. In case a certificate of the stock to be transferred shall

have been issued, the same must be surrendered prior to the transfer being made.

" 3. In case any assessment or assessments are due and unpaid on the stock to be transferred, the same must be paid in full with interest prior to the transfer being made.

" 4. Transfers may be made by the stockholders in person, or by duly authorized attorney, by the execution of an instrument in writing, without seal, in the transfer books as above provided, of the following form and tenor :—

" For value received, hereby assign and transfer unto all right, title, and interest in shares in the capital stock of the New York and New Haven Railroad Company. New York, 18

" 5. The execution of this instrument of assignment and transfer shall sell, assign and convey from the grantor to the grantee, all the rights, privileges and appurtenances of the shares of stock transferred, and shall also divest and discharge the grantor and his represesentatives from all liability thereafter for any and every assessment which may be, at any subsequent date, charged upon said shares and the holder thereof, unless the same shall have been again transferred to the said grantor.

" 6. Powers of attorney for the transfer of stock may be in the usual form, but they must be under seal, and executed by the holder of the stock in his proper handwriting, or by one of the firm, when the stock is in the name of a firm, in which case one seal as the seal of all the members of the firm will be deemed a compliance with this resolution."

At the time the plaintiffs' certificate, dated March 23rd, 1849, was issued, there were standing on the transfer books of the company credited to the firm of R. & G. L. Schuyler, one hundred and sixty genuine shares of the company stock ; and when the plaintiffs other certificate was issued, there were standing on the books credited to the firm one hundred and seventy genuine shares of the stock. But at the time the first certificate was issued, R. Schuyler as transfer agent of the company had issued certificates of stock to the firm, over and above all the stock that at that time stood credited to the firm on the books, and which the firm then owned, and over and above the

25,000 shares of the capital stock, four hundred and ninety shares of stock ; and at the time when the other certificate was issued, Schuyler had over-issued like certificates of stock to the firm to the amount of four hundred and eighty shares. "These over-issued shares were not, at the times mentioned, transferred on the company's books, and it did not appear whether, at these times, the over-issued certificates of stock were held by the firm, or whether they had been passed to third persons, and therefore the court did not find that they had been so passed by the firm. Of these, certificates representing more than three hundred and fifty shares were afterwards, during the years 1849, 1850 and 1851, surrendered by the firm upon transfers of shares to that amount being made on the company's books to third persons. From the time when the plaintiffs took their certificates to the absconding of Schuyler there were like over-issues of certificates of stock to the firm to a much larger number of shares than the number represented by the plaintiffs' certificates, but from that time to the 18th day of October, 1853, there was stock standing on the transfer books to the credit of the firm ; and during a great part of the time, to a much larger number of shares than the number here in suit ; all of which was represented by other certificates issued to the firm. Up to the 18th of October, the over-issues to the firm consisted of certificates of stock merely, without transfers to sustain them, but afterwards the over-issues consisted in stock transferred by the firm on the stock ledger as well as in certificates of stock, so that after the 18th of October there was no stock standing to the credit of the firm on the stock ledger of the company.

On the 5th day of July, 1854, the defendants closed their transfer books on account of the discovery of the fraud of Schuyler, and in order not to complicate their stock accounts any further. After the books were closed the cashier of the plaintiffs called at the transfer office of the defendants in the city of New York, to demand of the defendants in behalf of the plaintiffs to be allowed to transfer to them on the books of the company the stock represented by the plaintiffs' certificates. One or more of the directors of the company were in the

office at the time.   The cashier showed the plaintiffs' certificates to one of them and demanded to be allowed to make the transfer on the books.   The director replied that there was no transfer agent, that the transfer books were closed, and that no transfers of stock could be allowed.   There was no transfer agent at this time, nor has there been since until recently, and the transfer books of the defendants have been kept closed, with one exception, until recently, in consequence of the fraud of Schuyler.   The books were opened and a new transfer agent appointed as soon as the spurious stock had been separated from the genuine, by the judgment in an action brought by the company for that purpose, and an injunction which had been issued prohibiting transfers had been dissolved.   A short time before this suit was brought, one Buckingham, acting as the agent and attorney of the plaintiffs, went to the transfer office of the company with the certificates of the plaintiffs, and demanded of the person placed by the company in charge of the transfer books to be allowed to transfer the stock represented by the certificates to the plaintiffs.   The person in charge replied that the transfer books were closed, that a demand had been previously made by the plaintiffs, and that a transfer could not be allowed.

Up to the time of the last demand the genuine stock had not been distinguished from that which had been fraudulently issued, and it could not have been distinguished except by a long and tedious investigation of the books, requiring in all probability a number of weeks' labor, and that it could not have been made so as to be obligatory on all parties except by an action, such as that already mentioned, in which the separation was made.   The defendants claimed on the trial that they were justified under the circumstances in refusing to allow a transfer ; and the court found that if any like circumstances would be sufficient to justify a refusal, the circumstances under which the refusal was made would be sufficient for the purpose, unless the supreme court should be of the opinion that the stock fraudulently issued was stock of the company, and the holders thereof and of over-issued certifi-

cates entitled to all the rights of the holders of genuine stock and of genuine certificates.

A short time before the commencement of the present suit, Buckingham, before named, who was an attorney at law, residing and doing business in the city of New York, made a written contract with the plaintiffs by which he agreed to institute and carry on the present suit at his own expense and risk, receiving one third of the sum actually recovered; the bank agreeing to the same, and placing the certificates in his hands for the purpose of having the suit brought. The demand hereinbefore stated to have been made by Buckingham on the defendants was made after this contract had been entered into and for the purpose of bringing the present suit. The suit was brought by him under the contract, and during the trial, and after a motion by the defendants for a nonsuit on the ground that the agreement was champertous had been denied, the contract was rescinded by the parties by a written memorandum to that effect indorsed upon it. The defendants however still insisted that the case should be dismissed, and that if it was not, the demand made by Buckingham was of no legal effect, because made under and for the purpose of carrying out an unlawful agreement.

The value of the stock of the company at the time when the demand was made by the cashier of the plaintiffs, was seventy-five per cent of the par value, and at the time when the demand was made by Buckingham, was sixty per cent.

Upon these facts the case was reserved by the superior court for the advice of this court.

*Dutton,* and *E. S. Van Winkle* of New York, with whom was *J. M. Buckingham* of New York, for the plaintiffs.*

This case differs essentially from that of the Mechanics' Bank against the same defendants, reported in 3 Kernan, 599,

---

* Henry S. Sanford Esq., of New Milford, argued the case in the superior court, and had prepared himself for the argument of it here, but was disabled by sickness. In view of the great interest of the case and the importance of the principles involved in it, I have given much greater space to the arguments of counsel than I feel at liberty as a general rule to do.                      R.

and which is much relied upon by the defendants' counsel. In that case the plaintiffs, admitting their stock to be spurious, claimed that the defendants were nevertheless liable on the ground of the fraud of the defendants' agent, Schuyler. In this case the plaintiffs claim that their certificates represent good stock, and that they are entitled to damages for the defendants' refusal to permit the transfer of it. If this claim can be sustained, we shall have no occasion to discuss the liability of a principal for the acts of his agent; and if it can not be sustained, there is an end of the case, unless the court shall be of opinion that the defendants are estopped from asserting the spuriousness of the stock; a possible view of the case which will render necessary the discussion of the doctrine of agency.

We claim that our certificates are valid, and represent good stock. We present to the court at least a *prima facie* case, which has not been overthrown. The burden of proof that they are false rests on the defendants. We produce certificates of stock, in due form, issued from the defendants' office, cut from their own books, registered in their accounts, and signed by their proper officer. Against this there is no direct proof that the certificates are fraudulent. It is found that when they were issued the Schuylers had abundant good stock to meet their requirements. The plaintiffs took them in good faith for value. But, say the defendants, although they had good stock enough, yet they had also issued and then held certificates to a large amount for spurious stock, and they gave the plaintiffs a part of their false certificates. The facts are against that supposition. They did not surrender any of those false certificates until afterwards. They still held them all, and therefore the plaintiffs' certificates are to be supplied out of the good stock held by them at the time. If a man has good stock and bad stock, and there is no ear-mark to distinguish them, and he sells a certain number of shares of stock and gives a certificate, does not the purchaser take good stock? Again, it is found that all the certificates of spurious stock then held by the Schuylers were subsequently surrendered; but our certificates have never been surren-

dered. How then can they represent any of the spurious stock ?

. But, say our opponents, even if the certificates you hold represent genuine stock, your title is not strictly deduced. Your power of attorney was executed in blank, and was only filled up at the trial ; and they cite various English authorities tending to show that such powers are nullities. But such powers are not nullities, as the American decisions abundantly show, and as many English authorities also admit. *Kortright* v. *Commercial Bank of Buffalo*, 20 Wend., 91 ; *Fatman* v. *Lobach*, 1 Duer, 356, 361 ; Redfield on Railways, § 35 ; *Hobblewhite* v. *McMorine*, 6 Mees. & Wels., 208, and notes in Am. edition ; *Mitchell* v. *Culver*, 7 Cowen, 336 ; *Boyd* v. *Brotherson*, 10 Wend., 93 ; *U. States* v. *Nelson*, 2 Brock. C. C. R., 64 ; *Leavitt* v. *Fisher*, 4 Duer, 1: There is an important difference between blanks in deeds of real estate and blanks in other instruments which are technically deeds, because sealed, but which are not subject to the same strict rules.

We are then met by the further objection, that no proper demand has been made on the defendants. The first demand was by our cashier, who was clearly a proper agent for the purpose. Ang. & Ames on Corp., § 301. The second demand was made by Mr. Buckingham ; and the judge below finds, as a fact, that he was in that matter " acting as the agent and attorney of the plaintiffs." But, say our opponents, Mr. Buckingham had made a champertous agreement with the bank, and therefore his acts were void, and the plaintiffs must be nonsuited. Now, champerty is regulated by statute in Connecticut, and the sole penalty is a fine of $100. Rev. Stat., tit. 33. But champerty, even at common law, never destroyed the contract or claim which was the subject of the champertous agreement; it only vitiated the champertous agreement, so that neither party could recover on it against the other. The case of *Earle* v. *Hopwood*, 7 Jurist, 775, cited on the other side, was a suit brought on the champertous agreement. But they say that we did not make our demand of the proper party. We certainly went to the proper place, the transfer office of the defendants, where they were bound to have the proper person, and inquired of a per-

son who had charge of the transfer books; and if the defendants had not a proper person there, as they were bound to, that is not our fault but theirs. A demand at the proper place, at all reasonable and customary times, is a good demand, and the absence of a proper agent to respond is an unqualified refusal. But they say there was a person there, but not authorized to act. Then we received no response, and the various reasons alleged by such unauthorized person are mere nullities, and we are authorized to disregard them. But again they say, that at least at the time of the first demand, the circumstances were such as to justify a refusal on their part. They say that then there was no transfer agent, and that the transfer books were necessarily closed until the affairs of the company could be investigated. But, admitting that these reasons were sufficient at the time, their refusal should not have been an absolute one, and they were bound to use diligence.in investigating their affairs and preparing to open their books; and clearly, when the second demand was made, there was no justification in the circumstances of the company for the refusal, and that demand was clearly sufficient, if as we claim Mr. Buckingham had authority to make it.

We have thus far proceeded upon the theory that our certificates are valid, and, so regarding them, we might here rest our case. But the defendants contend, and rely principally for their defense upon the claim, that the stock which they purport to represent is spurious and the certificates of no validity. This makes it necessary for us to consider the case upon that theory. And we contend that if the certificates were fraudulently issued by the defendants' transfer agent, they are liable to the plaintiffs for the loss which they have suffered from the fraud. The plaintiffs, acting in good faith, have suffered damage through the fraudulent acts of the defendants' agent in a matter within the course of his employment, he professing to act as such agent, and his act having all the outward indicia of authority, and incapable of being performed except by virtue of and under color of such agency, and intended to receive credit from all to whom it should come. For such acts, although a fraud upon the defendants them-

selves, they are liable. " It is a general doctrine of law, that although the principal is not ordinarily liable in a criminal suit for the acts of his agent, unless he has authorized or co-operated in those acts, yet he is held liable to third persons in a civil suit for the frauds and other misfeasances and omissions of duty of his agent, in the course of his employment, although the principal did not authorize or justify, or participate in, or indeed know of them, or even if he forbade them, or disapproved of them." Story on Agency, § 452. And this rule is abundantly sustained by other authorities. Lloyd's Paley on Agency, 294, 305. 1 Parsons on Cont., 62. 2 Kent's Com., 633. Smith on Merc. Law, 133, and cases there cited. Smith on Master & Servant, 152. *Phila. & Reading R. R. Co.* v. *Derby*, 14 Howard, 468, 486. *Ridgway* v. *Farmers' Bank*, 12 Serg. & Rawle, 256. *Bank of U. States* v. *Davis*, 2 Hill, 452, 462. *North River Bank* v. *Aymar*, 3 id., 262. *Exchange Bank* v. *Monteath*, 17 Barb., 171. *Mechanics' Bank* v. *Butchers' & Drovers' Bank*, 16 N. York, 125. A corporation is liable for the wrongful acts of its agents in the same manner as individuals are. *Bank of Columbia* v. *Patterson's Admr.*, 7 Cranch, 299. *Smith* v. *Birmingham & Staffordshire Gas Light Company*, 1 Ad. & El., 526. 2 Kent's Com., 292. Ang. & Ames on Corp., § 387. Story on Agency, § 308. *Life & Fire Ins. Co.* v. *Merchants' Fire Ins. Co.*, 7 Wend., 31. *Minor* v. *Mechanics' Bank of Alexandria*, 1 Peters, 46. *Goodspeed* v. *East Haddam Bank*, 22 Conn., 530. On these general principles, so well established, if the plaintiffs show that in this matter Schuyler acted as the defendants' agent, or was by them clothed with such powers that, acting ostensibly as such agent, third persons could not distinguish his fraudulent from his genuine acts, then the defendants are liable to the plaintiffs for the damages they have suffered in this case. The stock was personal property, transferable in such manner as the by-laws of the company should direct. Charter, § 2; 4 Priv. Acts, 1020. The directors had power to make by-laws and regulations as to the disposition and management of the stock and other property of the company. Charter, § 7. The fact is found that the certificates in question conform in

every respect to the certificates which are admitted to be genuine, and are such as the company have always been in the habit of using. The defendants established a transfer office, according to their charter, in the city of New York, and appointed Schuyler who was their president as their transfer agent. He was as such charged with the general superintendence of the transfers of stock, and with the issuing of the certificates of stock. He signed all the certificates as transfer agent, and kept the transfer books, and no transfer was valid unless recognized by him. These things were all in the course of his employment, and in this special business he was general agent, for an agent for a special purpose may have a general authority in regard to it. Dunlap's Paley's Agency, 99, and notes. *Jeffrey* v. *Biglow*, 13 Wend., 518. *Anderson* v. *Coonley*, 21 id., 279.

The purchaser of certificates thus issued was not bound to look beyond the genuineness of the certificates. Schuyler was acting within the scope of his authority. The defendants had clothed him with the means, armed him with the power, and placed him in the position, to do the very acts he did. In issuing certificates of spurious stock, no more than of valid stock, did he perform any act which he had not the power to perform. Everything he did was ostensibly in fulfillment of a lawful official duty devolved on him. *Converse* v. *Mutual Ins. Co.*, 1 Comst., 292. What he did was not in *excess* of his power, but in *abuse* of it. It was a fraudulent use of the powers duly vested in him. He abused his trust. If he had been a faithful or an honest agent, could the plaintiffs' certificate have been spurious? And does not every principal guarantee the faithfulness and honesty of his agent in the matter of his trust, especially when the principal alone has the means of his detection. Story on Agency, § 452. Smith's Master & Servant, 125. *Munn* v. *Commission Co.*, 15 Johns., 44. *Williams* v. *Mitchell*, 17 Mass. R., 98. *Foster* v. *Essex Bank*, id., 496. There is nothing exceptional in this case, or that would take it out of the operation of the general principles above declared.

The view we have just presented is founded upon the theory

that the certificates are shown to be fraudulent, but we contend that the defendants are precluded from setting up that fact in defense, for in this matter the act of their agent was their act, and no one shall be allowed to plead his own turpitude. The provision conferring on the defendants the right to regulate the transfer of their stock was intended for the security and benefit of the company. *Bank of Utica* v. *Smalley*, 2 Cowen, 170. *Gilbert* v. *Manchester Iron Man. Co.*, 11 Wend., 627. *Kortright* v. *Buffalo Com. Bank*, 20 id., 91. *Bank of Kentucky* v. *Schuylkill Bank*, 1 Parsons' Select Eq. Cas., 247. Under the regulations adopted certificates of stock were to be issued to all stockholders, and the right to issue such certificates rested at this time solely in Schuyler. He had the full power of the company itself in the matter. It was not the duty of the assignee of a certificate, in the absence of suspicious circumstances, to inquire into the truth of it, because it was the province of the company to issue only true certificates. Moreovever, the purchaser had no means of ascertaining the truth. If the company themselves, owners and keepers of the books, could not ascertain which certificates were good and which bad, and did not detect any false certificates until they had reached an enormous amount, much less could a purchaser. The meaning of the certificate was, that the company gave to some one an assurance—1st., that the person named in it as a stockholder was such ; 2d., that on the surrender of the certificate the stock mentioned in it was transferable on their books; 3d., that no transfer would be allowed without the surrender of the certificate,—in effect that the party named in the certificate, or the holder of it under authority from such party, had the possession and control of the stock therein expressed. The issuing of such assurances was a lawful and proper exercise of the powers given by the charter ; it was beneficial to the stockholders, not as giving them proof of title, (which would always appear on the corporation books,) but as giving proof to others of their title, of the transferability of the stock, and of the control which the possession of the certificate conferred. By the well-known course of business, as well as by the terms of the

certificate, it was an assurance intended for exhibition to others, and a means of safely dealing on the faith of it; each certificate having appended to it a printed form of transfer and power of attorney. The company were bound to see that these certificates were true. This obligation clearly rested on them in favor of the stockholder, in consideration of his interest in the company; and in favor of one who should act on the faith of it, in consideration of the credit it invited, and the parting with value on the faith of it.

The certificates were legal documents, sufficient and necessary to legalize stock contracts under the law of stock jobbing. Being issued with the intent that they should be the basis of dealings with persons other than stockholders, the company became bound to such persons according to the terms and obligations of the certificates. They were not under seal, so as by any technical principle to be limited to the party named. They were general in their address, as widely so as any general letter of credit or invitation to give trust on the ground of a fund admitted to be in hand. They formed, in intent and in fact, estoppels in pais. *Welland Canal Co.* v. *Hathaway*, 8 Wend., 480. *Dezell* v. *Odell*, 3 Hill, 215. *Town* v. *Needham*, 3 Paige, 545. They were of no use if they were not exactly true and were explainable. They are not in this respect like a bill of lading. The latter document is explainable in its nature, is a mere receipt to facilitate proof of delivery, and to evidence the contract for the carriage. As a receipt it is explainable, and so well understood by all who take it; as a contract, it is not.

To require those who acted on the certificate to ascertain, at their peril, from the books of the company, subject to the possibility of false entries by officers of the company in those books, whether the certificates were correct, is repugnant to the face of the certificate, to the purpose of it, and to the duties committed to the officers of the company. It would defeat the transferability of the stock. If the defendants would not be estopped by the nature of the certificate and the authority of the officer issuing it, yet the gross negligence of the officers of the company for a series of years, by means

whereof their transfer agent was enabled to commit this fraud, precludes them from denying his acts against innocent third parties.   *Orr* v. *Union Bank*, 29 Eng. Law & Eq. R. 1. *Thompson* v. *Blanchard*, 4 Cowen, 303, 309.   *Converse* v. *Mutual Ins. Co.*, 1 Comst., 290, 292, 293.   *Gregg* v. *Wells*, 10 Ad. & El., 90.

It is necessary, however, to examine the various positions taken by the defendants to show that this is a case to which the principles which we have presented do not apply.   It is alleged that the act was *ultra vires*, because no agent, not even the board of directors itself, could create more stock than the charter authorized.   But the issuing of certificates of stock, although fraudulent, was not *ultra vires*.   They were expressly authorized to issue certificates.   The act in itself was a proper act, and it is a confusion of terms to call that an act *ultra vires*.   No act is *ultra vires* unless it is in its nature forbidden or unauthorized by law, as if a railroad corporation should set up a bank.   Schuyler's act was an abuse of a lawful power, not the assumption of an illegal one.

Again, it is said an illegal act never estops.   Granted; but it must be an act illegal in its nature or kind, not an abuse of a legal act.   It must be an act forbidden by the law, and the very nature of which is proof of its illegality.   It is said that Schuyler was the agent of the defendants only to do rightful acts, and when he did wrongful acts he ceased to be their agent. If he committed the wrongful acts in the course of his employment, if the doing of like acts was within the scope of his employment, then he was their agent throughout, so far as third parties were concerned.   If this convenient doctrine is sound, when can a principal be held liable for the wrongful act of his agent ?   No man appoints an agent to do a wrong, and if the moment an agent transcends his authority his relation to his principal ceases, when can a principal be held for a wrongful act ?   And yet it is well settled that he can be so held.   Judge Comstock, in giving an opinion in favor of these defendants on the general question of their liability for the over-issued stock, in the Mechanics' Bank case, 3 Kernan, 599, expressly so holds, and the same is held in *Farmers &*

*Mechanics' Bank* v. *Butchers and Drovers' Bank*, 16 New York, 128. It will be found that in all the cases relied upon by the defendants on this point, the act itself, in its very nature, was utterly prohibited by the law or was wholly unauthorized. The cases of *Bank of U. States* v. *Dunn*, 6 Peters, 51; *Life & Fire Ins. Co.* v. *Mechanics' Ins. Co.*, 7 Wend., 31; *Hodges* v. *City of Buffalo*, 2 Denio, 110; *McCullough* v. *Moss*, 5 id., 567; *Halstead* v. *Mayor of New York*, 3 Comst., 430, and *Broughton* v. *Manchester Water Works*, 3 B. & Ald., 1, cited on the other side, will be found on examination to be all of this character. But the act of Schuyler was not the doing of a thing either unauthorized in its nature or prohibited by the law. It was his duty to issue certificates of stock in proper cases, and if he did it in improper cases the act itself was not illegal in its nature, but an abuse of a legal power.

We are also called upon to meet another doctrine, which is, that if the agent willfully, while engaged in the business of the principal, turns aside from that and commits an injury, the principal shall not be liable. But that is an entirely different case from the one before the court. There was no willfulness or maliciousness here apart from the fraudulent design. Our opponents say that the principal is never liable for the torts of his agent in any matter beyond the agency, unless he has expressly authorized them, or has subsequently taken the benefit of them, and hence that the principal is not liable for the willful or malicious act of his agent. This is a *non sequitur*. The reason of the rule lies deeper, and in the very doctrine by which the principal is held liable at all for the acts of his agent. Where my agent does a thing willfully or maliciously, and departs from the line of his duty to do it, he is doing an act in which I have not asked a third party to place any confidence. I have not guaranteed to the world his amiability or want of malice. Of course, if, to gratify his private malice, he does an act accompanied by willful force, he is not my agent, any more than if I employ an agent to carry money to the bank to pay my note, and he gets into a fight and kills a man on the way, he would be my agent in doing it. This is

the reason of the distinction, and it is supported by all the authorities. *McManus* v. *Crickett*, 1 East, 106. *Croft* v. *Alison*, 4 B. & Ald., 590. *Wright* v. *Wilcox*, 19 Wend., 345. *Vanderbilt* v. *Richmond Turnpike Co.*, 2 Comst., 479. *Foster* v. *Essex Bank*, 17 Mass., 479.

Nor is there any force in the argument made on the other side, that no right of action can be founded on this certificate, because, as is said, it is a forgery. Here is another abuse of terms. A forgery by well settled definition is where any person, with intent to defraud, falsely makes, alters, forges or counterfeits any instrument or writing, being or purporting to be the act of another. 2 N. Y. Rev. Stat., 673. This was not the making of an instrument purporting to be the act of another ; it was not the alteration of an instrument ; it was not a forging, in the old sense, of the instrument ; neither was it counterfeiting ; and so the cases hold. There have been cited on the other side numerous decisions in regard to forgery in Great Britain and this country ; but they are all either cases where the party placed another's name to a genuine instrument, or where he put a false instrument before a genuine name. In each case he forged something. Such were the cases of *Meade* v. *Young*, 4 T. R., 28, *Regina* v. *Wilson*, 2 Car. & Kir., 527, *Regina* v. *Blenkinsop*, id., 531, and *The People* v. *Peacock*, 6 Cowen, 72, referred to on the other side. And in the case of *Putnam* v. *Sullivan*, 4 Mass., 45, the court held that a fraudulent use of a blank endorsement was not forgery.

But we are met by still another objection, which is, that even although these certificates fraudulently issued by Schuyler would be binding on the company while in the hands of a bona-fide holder to whom they had been directly issued, yet that the assignee of such certificates has acquired no rights against the company. In the well-known example in the books, of the lighted squib thrown into a crowd, where he whom it struck threw it away from him against another person, whom it injured, the injured person was allowed his redress against the original wrongdoer. And where a manufacturer of medicine labeled it erroneously, and it was sold

from hand to hand, until in the consumer's hands it produced damage, the original manufacturer was held liable in damages. *Thomas* v. *Winchester*, 2 Seld., 397. And see particularly the points made and authorities cited in that case by Mr. Hill, on page 401. The liability of the defendants in this case, however, can be placed on other grounds, which arise out of the assignability or quasi negotiability of these certificates of stock. The term "negotiability," derived from the Latin *negotium*, indicates its origin in the necessities of traffic. At common law, no chose in action could pass except by assignment. Then, by the exigencies of society, bills of exchange passed by mere indorsement or delivery; then next, promissory notes; and then the statute of Anne legalized what custom had already established. But although statutes are stationary, common law is progressive, and courts administering it have declared quasi negotiable various instruments that the statute does not cover. Just before the statute of Anne was passed, Lord Holt declared that the endeavor to uphold the negotiability of promissory notes " proceeded from the obstinacy and opinionativeness of the merchants, who were endeavoring to set the law of Lombard street above the law of West minster Hall." *Clerke* v. *Martin*, 2 Ld. Raym., 757. But the " obstinacy and opinionativeness of the merchants " continued, and the statute of Anne was passed; and now outside of that statute we have acknowledged as negotiable exchequer bills, East India Company's bonds, state bonds, railroad bonds and bills of lading. We have already referred to three decisions in New York which hold that certificates of stock with a blank power of attorney attached are quasi negotiable. It is true that in the case of *Mechanics' Bank* v. *N. York & N. Haven R. R. Co.*, 3 Kernan, 627, Judge Comstock denies that they are negotiable, and gives as a reason, that all the instruments declared to be quasi negotiable " are in some form the representatives of money, and may be satisfied by the payment in money at the time specified; but certificates of stock are not securities for money at all." But bills of lading, which involve no payment of money, and are, like stock certificates, simply evidence of the holder's title, are negotiable. The exigencies of commerce out of which grew the negotia-

bility of all the instruments that are now negotiable, have practically made shares of stock quasi negotiable, and the courts of New York in the cases before cited have held them negotiable. It was also so held in *Bank of Kentucky* v. *Schuylkill Bank*, 1 Parsons' Select Eq. Cas., 180. Against it we have the opinion of Judge Comstock, and that is all. This court is now called on to pass on this important question ; and authority and reason, and the exigencies of commerce, call upon it to declare these instruments to be quasi negotiable. An argument on the strength of certain cases recently decided in England, touching bills of lading and warehouse receipts, has been pressed upon us. The cases of *Grant* v. *Norway*, 10 Com. B., 665, *Hubbersly* v. *Ward*, 8 Exch., 330, and *Coleman* v. *Riches*, 29 Eng. Law & Eq., 323, have been referred to. These sustain the view that bills of lading and warehouse receipts are not negotiable, so as to give an assignee thereof a remedy for fraud committed by them. In these cases the court admits that the question is new, and that they find very little in the books upon it. We think those decisions will hardly meet with the approval of this court. But if they should, it is perhaps immaterial, for a bill of lading differs essentially from a certificate of stock, and the power of a captain of a ship as an agent is clearly distinguishable from that of a transfer agent. In the first place, the object of a bill of lading is not, like that of a certificate of stock, to afford evidence of the ownership of the subject matter. A bill of lading consists first of a receipt, which is always explainable, and in itself not negotiable ; and secondly, of a contract for the safe transportation and delivery of merchandise. The province of the captain of a ship, as the judge says in one of those cases, is " to make contracts, not statements ; " but the province of a transfer agent, we say, is just the reverse, and is to make statements not contracts. Again, a bill of lading represents, or is supposed to represent, actual, visible and tangible property, which is capable of a manual delivery and physical inspection, and the correctness of the bill of lading is susceptible of proof in that way. It relates to and represents things which are not in their nature negotiable, whereas, a

certificate of stock is more like a bill of exchange or promissory note, which represents an intangible right not capable of manual delivery or actual inspection. In *Grant* v. *Norway*, the court says the master's authority is to *contract for the carriage of goods put on board*. His power only begins when the goods are shipped. Neither had the ship-owners there been guilty of any negligence, as in this case the corporation has. See also in this connection, *Berkley* v. *Watling*, 7 Ad. & El., 29, 39, *Howard* v. *Tucker*. 1 B. & Ad., 712, and *Gurney* v. *Behrend*, 3 El. & Blackb., 622, which latter case was cited on the other side. A captain of a ship, moreover, is not a general agent, nor even a special agent, to certify to *ownership* of goods—he is only a special agent for a particular ship for a particular voyage ; but for any other ship or any other voyage his bills of lading are null. An indorser of a bill of lading may therefore be bound to see that the special authority is fulfilled, and that the goods are in that particular ship for that particular voyage. He is a special agent ; but a transfer agent is a general agent as to the whole stock. " Regularly, the master is only the agent of the ship owner, and has nothing to do with the cargo, but for its safe keeping and transportation. The supercargo represents the cargo, and has nothing to do with the ship." *Ross* v. *Ship Active*, 2 Wash. C. C. R., 226. And Molloy, in his treatise *De Jure Maritimo*, book E. ch. 2, says : " A master of a ship is no more than one who, for his knowledge in navigation, fidelity and discretion, hath the *government* of the ship committed to his care and management ; and by the common law (by which properties are to be guided,) he hath no property, either general or special, by the constituting of him a master."

Upon the general question, whether a corporation is liable to the transferees of its certificates for the fraud of its transfer agent, the weight of authority is decidedly in our favor in the recent adjudications upon the subject. In the case of *Mechanics' Bank* v. *N. York & N. Haven R. R. Co.*, in the superior court of New York, 4 Duer, 480, four out of the five judges who heard the cause held the company liable : among them was Chief Justice Oakley, who was one of our first jurists.

The superior court of New York is emphatically the commercial tribunal of this country. The decision of the superior court was reversed in the court of appeals. 3 Kernan, 599. The judges of that court certainly are not more able than those of the superior court. Judge Comstock delivered the only opinion given in the court of appeals; and we think we are justified in saying it was opposed to the opinions of three-fourths of the New York bar, and to the convictions of nine-tenths of the business community. But we would call the special attention of the court to the case of *Bank of Kentucky* v. *Schuylkill Bank*, 1 Parsons' Select Eq. Cas., before referred to. The Bank of Kentucky and the Schuylkill Bank were corresponding banks, and the Schuylkill Bank acted as the transfer agent in Philadelphia of the Bank of Kentucky. Mr. Leviss, the cashier of the Schuylkill Bank, as an officer of that bank, filled the post and performed the duties of this transfer agency, and as such agent he issued fraudulent certificates of stock of the Bank of Kentucky, precisely like the certificates of stock in question here, to the amount of nearly two millions of dollars. When the fraud was discovered the holders of the spurious stock claimed to recover of the Bank of Kentucky. The Bank of Kentucky, advised that she was liable, assumed the fraudulent stock, and then instituted her suit against the Schuylkill Bank, and the Schuylkill Bank resorted to all the defences and urged all the arguments that the defendants have urged, here and elsewhere, to show she was not liable for the fraudulent acts of her agent; and the result was, that the court held the Schuylkill Bank liable to the Bank of Kentucky in the amount of the fraudulent certificates, treating the Bank of Kentucky as the representative and assignee or transferee of the original holders of the spurious certificates, and holding the Schuylkill Bank liable for the fraudulent acts of its agent. The case was argued elaborately on both sides by some of the ablest jurists in America, and the court appears to have examined it with a great deal of care and deliberation. That case is entirely parallel to ours. We would add that Judge Ingraham of the supreme court of New York, since the decision of the court of appeals in this very

matter, has given a decision in a case not yet reported, holding these defendants liable in damages to the holders of the spurious certificates. Thus we have the weight of authority decidedly with us.

*Baldwin,* and *W. C. Noyes* of New York, with whom were *Hawley* and *Abernethy,* and *E. T. Gerry* of New York, for the defendants.

This is an attempt to induce the courts of Connecticut to adopt different principles' from those held and settled in the State of New York in the course of the litigation arising from the Schuyler frauds.

This action is for breach of corporate duty in not permitting certain transfers of alleged stock to be made. It is not founded on any express contract; nor upon misrepresentation, or fraud; but on alleged breach of duty in not permitting a transfer by the plaintiffs, as attorneys and assignees of R. & G. L. Schuyler, of genuine stock, alleged to belong at the time of the assignment to the latter, to the damage of the plaintiffs as equitable owners thereof.

Prior to August 1851, the capital stock of the defendants was $2,500.000, divided into shares of $100 each, all of which had been subscribed, paid for and distributed. This amount could only be increased by the action of the board of directors, taken expressly for that purpose; and although the company had by charter the right to increase that amount to $3,000.000, yet when by the action of its directors that amount was reached, their power was entirely exhausted in that respect. *Mechanics' Bank* v. *N. York & N. Haven R. R. Co.,* 3 Kern. 597; *Illius* v. *N. York & N. Haven R. R. Co.,* U. S. Circuit Court for southern district of New York, per Nelson J.; *N. York & N. Haven R. R. Co.,* v. *Schuyler,* 17 N. York, 592. This principle was settled in effect in the case of *Hood* v. *N. York & N. Haven R. R. Co.,* 22 Conn., 502, where it was held that a corporation can not go beyond its corporate powers, and can not be estopped from setting up the want of corporate power. See also *Day* v. *Green,* 4 Cush., 433; *Fairtitle* v. *Gilbert,* 2 T. R., 171. The principle may

be considered as a settled one and no longer open to contro-
versy. The legislature alone can determine the amount of
the capital stock of a corporation. To increase its capital
beyond the charter limit is a usurpation of power on the part
of the corporation. A *quo warranto* will lie at any time
against a corporation thus usurping power. The *quo war-
ranto* is a criminal proceeding. The corporation is therefore
doing a criminal act in exceeding its powers, for doing which
it may be deprived of its charter.

The by-laws of the defendants entitled genuine stockholders
to certificates of their stock. Duplicate certificates were pro-
hibited.

On March 23d, 1849, R. & G. L. Schuyler held certificates
for the 160 shares they owned, and also for over 400 shares
which they did not own and were not entitled to, and which
in fact had no legal existence. The certificates then issued
for forty shares, and also for the fifty shares on March 30th,
1859, now held by the plaintiffs, were issued by Robert Schuy-
ler to himself and brother, comprising the firm of R. & G. L.
Schuyler, fraudulently and without authority, as he well
knew. Those certificates created no obligation in favor of the
Schuylers as against the defendants, and did not entitle them
to a transfer of non-existing shares, or of shares for which
certificates were then outstanding. They were forgeries, and
Schuyler could not issue them to his own firm, or make any
contract for it with the company by the certificates. *Me-
chanics' Bank* v. *N. York & N. Haven R. R. Co.*, supra. If
the company itself by its stockholders or its directors could
not do it, most clearly its transfer agent could not. The cer-
tificates were therefore *ultra vires*—wholly unauthorized, and
*illegal* in a criminal sense. And in this view we may lay
wholly out of the case the fraudulent intent of Schuyler in
issuing them. They were void independently of his inten-
tion.

To meet this difficulty, the claim is made on the part of the
plaintiffs, that the certificates of stock were negotiable instru-
ments, and as such entitled to a credit and protection which
could not otherwise be claimed for them. But the certificates

are not the stock itself. They are only evidence of stock. A deed of land is evidence of title, but it is never negotiable, and mere evidence of title in any form is never negotiable. Negotiable notes possess other and larger qualities; they are the thing, not the evidence of the thing. The legal title to a negotiable note passes to an indorsee by the indorsement and delivery, but it does so on the ground that the note is itself the property, and passes by an actual and visible delivery to the holder. But the delivery of these certificates, with the most formal indorsement or assignment attached, would not pass the legal title to the stock; only an equitable title would pass. This is settled by the decisions of this court. *Marlborough Manufacturing Co.* v. *Smith,* 2 Conn., 579; *Northrop* v. *Newtown & Bridgeport Turnpike Co.,* 3 id., 544; *Northrop* v. *Curtis,* 5 id., 247; *Oxford Turnpike Co.* v. *Bunnell,* 6 id., 551; *Shipman* v. *Aetna Ins. Co.,* 29 id., 245. The by-laws of the company, which, being enacted under the authority of the charter, have the same force as if a part of the charter, (Ang. & A. on Corp., §§. 110, 325, 350; *Chilton* v. *London Railway Co.,* 16 Mees. & Wels., 212, 230,) provide that the transfers of the stock shall be " on the books of the company," and whoever holds a certificate is expressly so informed on the face of the certificate. It is therefore only such a transfer that can carry the legal title to the stock. The fact that only an equitable title passes by the transfer of the certificate, not only is decisive against the negotiable character of the certificates, but is very important in another relation; for if the plaintiffs took only an equitable title, they took the equity, whatever it was, of the Schuylers, and nothing more; which here was no equity at all, and consequently was no equity in the hands of the plaintiffs.

When the certificates were issued there was no stock represented by them; and not being stock, but only evidence of title to stock, they were nullities in their inception; as in the case of a deed without land to sustain it. They were also void, because Schuyler as agent of the company could not make a valid contract with himself or with his firm on the company's behalf. *N. York Central Ins. Co.* v. *National*

*Protection Ins Co.*, 4 Kern., 85 ; *Bentley* v. *Columbia Ins. Co.*, 17 N. York, 421.

As the Schuylers had no stock standing to their credit on the books of the company when the demand was made upon the defendants—if any proper demand ever was made—none could have been then transferred, if a transfer had been allowed. The transfer, if made in form, would have been inoperative. The corporation could not have recognized the plaintiffs by reason of any such transfer as owners of any stock, without either displacing some actual stockholder, or creating shares in excess of the capital, and thus committing a wrongful act. The declaration avers and the court finds that the whole $3,000.000 had been subscribed for and distributed.

Whatever rights the Schuylers acquired by the fraudulent certificates, the plaintiff acquired from them equitably and nothing more. They took them like the transferees of a note not negotiable, subject to all antecedent equities affecting them in the hands of their assignors. The certificates were not negotiable, and therefore no privity was created between their transferees and the defendants. Indeed, by the transfer of the certificates the plaintiffs became properly only the attorneys of Schuyler for the purpose of claiming a transfer on the books of the company on presentation of the certificate with the power of attorney. The case of *Farmers & Mechanics' Bank* v. *Butchers & Drovers' Bank*, 16 N. York, 128, cited on the other side, is distinguishable from this, on the ground that the instrument in that case, being a certified check, in legal effect a bill of exchange, was negotiable ; while in this the certificates were not. The certificates here were not only not negotiable in the legal sense, but they were forgeries. An instrument may be a forgery though the signature be genuine. Bac. Ab. *Forgery A* ; 3 Inst., 169 ; *Combe's Case*, Noy 101 ; *S. C.* Moore, 759 ; *Rex* v. *Hart*, 7 Car. & P. 652 ; *Regina* v. *Nash*, 12 Eng. L. & Eq., 578 ; *State* v. *Shurtleff*, 18 Maine, 368. The case of *Hibblewhite* v. *McMorine*, 6 Mees. & Wels., 198, is directly in point as to the non-negotiability of the certificates.

There was no valid demand or authority to make it. The power being in blank, no authority was thereby given to Buckingham to act as attorney. There was no waiver, because the demand was not made on an officer of the defendants legally authorized to waive any such defect. The by-laws of the company authorized transfers by power of attorney under seal. (By-law 6.) The law is well settled in England, that a power under seal can not be filled up after execution. *Hibblewhite* v. *McMorine*, 6 Mees. & Wels. supra. There having been then no authority to make any demand, and no person on whom any such demand could have legally been made, there was in fact no demand.

The principle was early settled in England, that an obligation under seal, executed with the name of the obligee in blank, is wholly void. Perkins, § 118 ; Comyn Dig., *Fait A.,* (1) ; Shep. Touch., 54 ; *Pigot's case*, 11 Coke, 27 ; *Shelden* v. *Hentley*, 2 Shower, 161 ; *Markham* v. *Gonaston*, Cro. Eliz., 626 ; *S. C.*, Moore, 547 ; Buller's N. P., 267. An attempt was at one time made to overthrow this doctrine ; but the cases which favored such change have since been overruled and can no longer be regarded as authorities. *Zouch* v. *Clay*, 2 Levinz, 35 ; *Paggett* v. *Paggett*, 2 Rep. Cas. in Cha. 410, 487 ; *Texira* v. *Evans*, 1 Luder Elec. Cas., 240, cited in *Master* v. *Miller*, 4 T. R., 320 ; *S. C.* 1 Anstr., 229, 2 H. Bla., 140 ; *England* v. *Roper*, 1 Starkie, 304 ; *Lewis* v. *Bingham*, 4 B. & Ald., 672 ; *Hudson* v. *Revett*, 5 Bing., 368. These cases are overruled by other and later authorities which support the early rule. Shep. Touch., 68 ; *Weeks* v. *Maillerdet*, 14 East, 568 ; *Powell* v. *Duff*, 3 Campb., 181 ; *Davenport* v. *Sleight*, 2 Dev. & Battle (Law,) 382, per Ruffin, Ch. J. ; *Hibblewhite* v. *McMorine*, 6 Mees. & Wels., 200 ; *S. C.* 7 Law. Jour., *N. S.*, 217 ; *S. C.* 4 Lond. Jurist, 769 ; *Davidson* v. *Cooper*, 13 Mees. & Wels., 343 ; *Squire* v. *Whitton*, 1 House of Lords Cases, 333 ; *Swan* v. *N. Brit. Austral. Co.*, 8 Jurist, *N. S.*, 940. In the United States the weight of authority supports the ancient doctrine. The following states favor it. California, ( *Turner* v. *Billagram*, 2 Cal., 523 ;) Connecticut, (*Hayden* v. *Westcott*, 11 Conn., 129.) Dela-

ware, (*Clendaniel* v. *Hastings*, 5 Harring., 408.) Georgia, (*Ingram* v. *Little*, 14 Geo., 174.) Kentucky, (*Lockhart* v. *Roberts*, 3 Bibb, 361.) Maryland, (*Byers* v. *McClanahan*, 6 Gill & J., 250 ; *Edelin* v. *Sanders*, 8 Maryl., 118.) Massachusetts, (*Waring* v. *Williams*, 8 Pick., 326.) Mississippi, (*Williams* v. *Crutcher*, 5 How., 71 ; *Dickson* v. *Hamer*, Freeman Ch., 284 ; *Long* v. *U. S. Bank*, id., 375.) New Hampshire, (*Burnham* v. *Ayer* 35 N. Hamp., 351.) North Carolina, (*McKee* v. *Hicks*, 2 Dev., 379 ; *Davenport* v. *Sleight*, supra.) Ohio, (*Ayres* v. *Harness*, 1 Ohio, 368.) Arkansas, (*Cross* v. *State Bank*, 5 Pike, 525.) South Carolina, (*Duncan* v. *Hodges*, 4 McCord, 239 ; *Boyd* v. *Boyd*, 2 Nott & McCord, 125.) Tennessee, (*Gilbert* v. *Anthony*, 1 Yerg., 69 ; *Wynne* v. *The Governor &c.*, id., 149.) The decisions in several of the states however have followed the erroneous principle adopted in *Texira* v. *Evans*, before alluded to. This is the case in Alabama, (*Boardman* v. *Gow*, 1 Stewart, 517 ; *Gibbs* v. *Frost*, 4 Ala. N. S., 720.) Louisiana, (*Breedlove* v. *Johnson*, 14 Martin, 517 ; *Collins* v. *Welsh*, 15 id., 82 ; *Charlaron* v. *McFarlane*, 9 La. R., 230 ; *The State* v. *The Judges, &c.*, 19 id., 179 ; *Bell* v. *Keese*, 13 La. Ann. R., 524.) Pennsylvania, (*Sigfried* v. *Levan*, 6 Serg. & Rawle, 308 ; *Stahl* v. *Berger*, 10 id., 170 ; *Wiley* v. *Moore*, 17 id., 438 ; *Graham* v. *Ogle*, 2 Penn. St. R., 132 ; *Fritz* v. *The Commissioners &c.*, 17 id., 130.) Virginia, (*Whiting* v. *Daniel*, 1 Hen. & M., 391 ; *Beery* v. *Homan's Committee*, 8 Gratt., 48 ; *Cox* v. *Thomas*, 9 id., 312 : but see *Harrison* v. *Tierman*, 4 Rand., 177, which sustains the old rule.) In New York the earlier cases followed *Texira* v. *Evans*, (*Wooley* v. *Constant*, 4 Johns., 54 ; *Ex parte Decker*, 6 Cowen, 59 ; *Ex parte Kerwin*, 8 id., 118 ; *Knapp* v. *Maltby*, 13 Wend., 587,) but the later authorities support the proposition as contended for. *Blood* v. *Goodrich*, 9 Wend., 68 ; *S. C.* 12 id., 525 ; *Chauncey* v. *Arnold*, 24 N. York R., 330. The decisions in the federal courts sustain it. *U. States* v. *Nelson*, 2 Brock., 64. An entirely different rule obtains in a class of instruments not under seal, as promissory notes and the like, and does not affect the principle here contended for. *Russell* v. *Langstaffe*,

Doug., 514; *Violette* v. *Patten*, 5 Cranch., 151. But the courts have long recognized a distinction between such and those under seal. Plowd., 308; *Powell* v. *Duff*, 3 Campb., 182, per Lord Ellenborough; *U. States* v. *Nelson*, supra; *Harrison* v. *Tierman*, 4 Rand., 177, per Cabell, J. And where such instruments are necessarily under seal, the old rule is applied. *Enthoven* v. *Hoyle*, 13 Com. Bench, 373; *S. C.*, 9 Eng. Law & Eq. R., 434. Besides, an alteration in a sealed instrument can only be legally effected by a power under seal. Story on Agency, § 49, and notes; Story on Cont., § 129; *Hanford* v. *McNair*, 9 Wend., 54; *Blood* v. *Goodrich*, supra.

But the assignment of the certificates, which is relied upon as a negotiation of them, could not pass the title, which is essential to the negotiation of any instrument, until it was filled up and the name of the assignee inserted. No legal title could pass by an instrument which contained no contract of transfer, and the naming of a party as the transferee was essential to its completeness and effect as a contract. But here the assignment, though executed by the Schuylers, was under seal, and so could not be filled up by the plaintiffs afterwards. The assignment and power of attorney are in the same instrument, but it could operate, in its creation of a duty for the company, only as a power of attorney authorizing the transfer on their books. But for this the equitable assignment might be regarded but as a transaction between the parties themselves for some special purpose, which it was not intended to consummate by a transfer on the books of the company. But by the by-laws of the company the power of attorney was required to be under seal, and in view of this requirement it was so executed by the Schuylers. But when filled up by the plaintiffs, by inserting their own names as assignees, though the contract might be regarded as the contract of the Schuylers, if it should be shown that they had agreed to such filling up, yet it would no longer be their contract under seal. *Hibblewhite* v. *McMorine*, supra; *Hayden* v. *Wescott*, 11 Conn. 129; *Blood* v. *Goodrich*, 9

Wend., 76 ; *S. C.*, 12 id., 525 ; *United States* v. *Nelson*, 2 Brock., 64.

When the plaintiffs received the certificates they were worthless, representing no stock. A subsequent accession of stock could not make them valid. There was no warranty, nothing which would make a new title enure to their benefit. Hence they had no claim on the 160 shares standing to the credit of the Schuylers, even if no prior certificates had been issued for them. Such prior certificates had however been issued. Upon the plaintiffs' own theory, these prior certificates must have carried with them the 160 shares, and it follows that the plaintiffs, being subsequent holders, or rather having acquired subsequent certificates, can not claim them. The stock passed to those who held these certificates and who sub. sequently transferred upon them 350 shares, being more than all standing to the credit of the Schuylers at the time.

The shares standing in the names of the Schuylers at the time of the issuing of the certificates and till the 18th of October, 1853, were all covered by these prior certificates and had all been transferred on their surrender at or before that date. If the Bridgeport Bank had applied before such transfer, probably the stock would have been transferred to them. But they voluntarily permitted Schuyler to appear as owner, and to represent the stock in the meetings of the company as such.

But this bank account or credit of stock amounts to nothing. It was only a private memorandum of stock untransferred on the books of the company ; not necessarily of stock of which the Schuylers were owners, or which they were entitled to transfer. On the plaintiffs' theory the holder of the certificate owned it and had a right to transfer it.

But by the law of Connecticut, (*Marlborough Manufacturing Co.* v. *Smith*, 2 Conn. 579 ; *Northrop* v. *Newtown & Bridgeport Turnpike Co.*, 3 id., 544 ; *Northrop* v. *Curtis*, 5 id., 247 ; *Oxford Turnpike Co.* v. *Bunnell*, 6 id., 352,) this stock was the property of the Schuylers *quoad* the defendants, until the holders of the certificates had presented them and changed the title by actual transfer. The holders of the 350

prior certificates did so, long before the plaintiffs presented their certificates, and hence transferred all the title out of the Schuylers, and left none for the plaintiffs.

It has been claimed that the company was estopped to deny that the certificates, though fraudulently issued by their transfer agent, represented genuine stock. We deny that such an estoppel can be created either by a fraudulent agent or even the directors themselves.

It had not the corporate power either to create new stock in excess of its capital or to displace the shares of a stockholder. *Fairtitle* v. *Gilbert*, 2 T. R., 171; *Day* v. *Green*, 4 Cush., 433; *Hood* v. *N. York & N. Haven R. R. Co.*, 22 Conn., 502. The duty of the corporation depended simply on the title. There was no privity between it and the Bridgeport Bank or their assignor. The following cases establish the principle on which we rely. *Schooner Freeman* v. *Buckingham*, 18 How., 187, 191; *Grant* v. *Norway*, 2 Eng. L. & Eq., 337; *Hubberty* v. *Ward*, 18 id., 323; *Mechanics' Bank* v. *N. York & N. Haven R. R. Co.*, 3 Kern., 626, 9; *Illius* v. *same*, U. S. Circuit Ct., Nelson J.; *N. York & N. Haven R. R. Co.* v. *Schuyler*, 17 N. York, 599, 603; *Farmers & Mechanics' Bank* v. *Butchers & Drovers' Bank*, 17 id., 140, 2.

Even if the plaintiffs had been equitable owners and entitled to a transfer of genuine shares when demanded, they were not injured by a refusal, since the books were then reasonably closed for the benefit and security of all the genuine stockholders and for the safety of the company.

No question of agency properly arises here, unless it is admitted that Schuyler had power to issue the certificates of stock as the agent of the company and thus bind them by his acts. But his whole power so far as conferred by the company was, when stock was transferred to issue a certificate of the fact. His powers were merely supervisory, with authority to certify to what was done under his supervision. He could not create a share of stock, nor transfer a share. The stock was full at this time, so that he had no power to issue new stock. The surrender of the old certificates and the transfer

of the stock, were conditions precedent of his right to issue certificates. This was not merely the extent of his authority, but it so appeared to all the world upon the face of the certificates themselves. His act in issuing the present certificates was a fraud. A principal is never responsible for the fraud of his agent in making a contract, unless he adopts the contract himself and claims the benefit of it, and then if he endeavors to enforce the contract the fraud of the agent is a good defense. It is only the same principle that declares a master not liable for the willful act of his servant where he commits a trespass. His act is something over and above what he has a right to do as servant of his master. *Foster* v. *Essex Bank*, 17 Mass., 514; *Udell* v. *Atherton*, 7 Lond. Jurist, N. S., 777. And mere negligence on the part of the company, not immediately connected with the fraud itself, is not sufficient to make them liable for the acts of Schuyler. This is not a case where the defendants can be charged with a neglect of duty, or with fault of any kind. It is not therefore a case for the application of the rule that where one of two innocent parties must suffer a loss, he shall suffer it whose act has put it in the power of the wrong doer to do the wrong. There must be actual negligence, and in relation to the very matter of the wrong, to bring a party within the application of this rule, and it will operate upon him then only by way of estoppel, or by giving to his act the effect of a ratification of the act of the wrong doer as his agent. *Orr* v. *Union Bank of Scotland*, 29 Eng. L. & Eq., 1; *Bank of Ireland* v. *Evans' Trustees*, 32 id., 23; *Pickard* v. *Sears*, 6 Adol. & El., 469; 1 Story Eq. Jur., §§ 384, 394.

But there has been no legal demand upon the defendants to allow the transfer to be made. Such a demand was clearly necessary. The first demand was made by the plaintiffs' cashier, the day after Robert Schuyler absconded. At this time no transfer agent had been appointed in his place. The court below has found that the closing of the transfer books of the company was necessary in consequence of the confusion of their affairs growing out of the newly discovered fraud of Schuyler, and that their conduct in refusing to allow the

transfer at that time was reasonable. The demand moreover was not made upon any person legally representing the company for such a purpose. The second demand was made by Mr. Buckingham, one of the attorneys for the plaintiffs, having an interest in the sum sought to be recovered, shortly before the commencement of this suit. This demand we claim was wholly without effect because of the champertous arrangement with Buckingham, made by the plaintiffs and under which the suit was brought. The champerty is found by the court below. Champerty still exists as a common law offense in this state. 2 Swift Dig., (rev. ed.,) 356, 7 ; 4 Bla. Com., 135 ; 4 Kent Comm., 499 ; *Stanley* v. *Jones,* 7 Bing., 369, per Tindal, C. J. The reason why there has been no recent case on the subject in Connecticut, is only because of late this sort of practice has not been indulged in. The effect of the agreement in question was not merely to render the institution of the suit unlawful, but to render every act done by Buckingham under the contract for the purpose of instituting the suit unlawful and void. The very contract which made him the attorney of the plaintiffs and authorized him to make the demand in their name was unlawful and void, and the demand was therefore of no legal effect. The subsequent release by Buckingham of the unlawful contract can not help the case. The demand when made was unauthorized by any legal agency and can not be rendered valid by subsequent acts of the parties. This demand being made under an illegal contract, and it being the duty of the court to refuse to execute such agreements, no favor should be extended to the plaintiffs ; and as the suit was commenced and prosecuted by Buckingham under the unlawful agreement, the defendants were entitled to the nonsuit for which they moved.

The ten shares of genuine stock which the Schuylers had acquired after the issuing of the first certificate, and which they held when the second was issued, even if they may be excepted from the general principles sought by us to be applied to the spurious stock, can not be recovered by the plaintiffs in this action. It is enough perhaps to say that there has been no legal demand of these shares, even if the demand be held

sufficient in other respects, the demand in each case having been for ninety shares, and not for the ten. If the defendants were not bound to allow a transfer of so many shares they rightly refused, and it was for the plaintiffs to demand the exact number to which they were entitled. But, independently of this objection, the plaintiffs have lost the equitable title to these shares as against the defendants, by not procuring a transfer before they were transferred on the books of the defendants to other purchasers ; the assignment of the certificates giving the plaintiffs at best, as already shown, an equitable title only. So long as they did not procure a transfer on the books they were in the position of a vendee of personal property who leaves the vendor in possession, or of a grantee of real estate who neglects to have his deed recorded, and were liable to lose their right to the stock by a transfer thereof by the Schuylers to some *bona fide* purchaser for value. The defendants are not chargeable with any fault in allowing the transfer of the stock to other parties. All they were legally bound to do was to see that parties seeking transfers had certificates to surrender ; and on the presentation and surrender of the certificates they were bound to allow the transfer. To have refused in such case would have been a breach of corporate duty.

The plaintiffs then, in taking a mere equitable title, and in leaving the Schuylers in legal possession of the stock, saw fit to incur this risk, and can not now look to any one but the Schuylers to make good their loss. From them they are clearly entitled to damages, but it would be inequitable that they should have a remedy against these defendants, to whom they gave no notice of their rights, and who only acted as they did in strict discharge of their corporate duty, which they were bound to perform in the absence of such notice.

The principle here applied to the ten shares of genuine stock thus acquired by the Schuylers after the issuing of the first certificates held by the plaintiffs and before the issuing of the second, is equally applicable to all the shares claimed by them, if they be held to be genuine stock, and not as we claim a part of the fraudulent issue, since the plaintiffs, taking only an

equitable title, have, by not getting a legal title on the books, lost their title as against subsequent *bona fide* purchasers for value, who have obtained transfers on the books of the company.

ELLSWORTH J. Several questions of the gravest character have been raised in this case, and have been argued with great learning and ability. Most of them we do not find it necessary to decide, as there is one which, in our opinion, is essentially decisive of the case. Thus, we need not determine whether, if the stock in question had been found to be spurious, there could be a recovery for the refusal of the defendants to allow a transfer of it, nor whether, if the transfer had been made, it would in that case have been of any benefit to the plaintiffs; nor need we determine whether the form of action adopted is the proper one for trying the question of the liability of the defendants for the frauds of their transfer agent in issuing fraudulent certificates of stock, nor whether such liability exists. We place our decision upon the ground that the defendants, upon whom the burden of proof upon this point clearly rests, do not show that the certificates held by the plaintiffs do not represent genuine stock, as in the absence of proof to the contrary they must certainly be taken as doing. The burden of proof upon this point, we say, is upon the defendants. Their agent, appointed for the express duty of issuing certificates to the holders of stock, issued these certificates, in the usual form, and for the purposes prescribed by their rules, and it is to be presumed, certainly in favor of these plaintiffs, who had become *bona fide* holders of the certificates upon the credit which their official character gave them, that R. & G. L. Schuyler had, at the time, good stock to which they would apply; which presumption must stand until the defendants show, as they can do, if such was the fact, that there was no stock standing in their names which could be represented by the certificates. When we say that the defendants could show how the actual fact was, we mean merely that they had the power to show it, and do not intend to express an opinion upon the question, controverted in the case,

whether they would be allowed to show it, against the certificate of their own officer.

The defendants have not shown that, at the time when the plaintiffs took their certificates, there was not genuine stock held by the Schuylers sufficient to answer to them. On the contrary, it appears that at that time the Schuylers held one hundred and sixty shares of good stock, which stood in their names, and which they could have legally transferred to the plaintiffs or any other purchaser. If there were nothing more in the case it would be clear that the defendants ought to have allowed the ninety shares, covered by the certificates held by the plaintiffs, to be transferred to them.

But here the defendants come in, and show that, before the plaintiffs received their certificates, Robert Schuyler, their transfer agent, and one of the firm of R. & G. L. Schuyler, had issued to the firm, in his official capacity, certificates of stock to the amount of four hundred and ninety shares, beyond the one hundred and sixty shares of good stock held by the firm, and thus they say that the genuine stock had been all exhausted before the plaintiffs' certificates were issued. It is, however, not found, and the judge expressly states that it was his intention not to find, that these certificates for the four hundred and ninety shares had ever passed out of the hands of the Schuylers. It can not be presumed, in the absence of all evidence on the subject, that those certificates had been transferred to other parties; much less can it be presumed that they had been so transferred upon a valuable consideration and to *bona fide* holders. So far as we can see, therefore, and as, upon the finding, we are to presume, the plaintiffs, when they received their certificates, were the first and only equitable purchasers and owners of ninety out of the one hundred and sixty shares held by the Schuylers.

The fact which is found, and which has been pressed upon us by the counsel for the defendants as one of great importance, that the greater part of these certificates were afterwards, in the years 1849, 1850 and 1851, surrendered to the railroad company by the Schuylers, and cancelled, and new certificates issued in their place to other parties, can not, we think, affect

the case. We regard the right of the plaintiffs to the stock represented by their certificates, as one already vested, and which, under the by-laws of the company, which forbade the transfer of any stock except upon the surrender of the certificate representing it, could not be defeated so long as they held the certificates. The plaintiffs, relying upon the by-laws of the company, and the provisions of the certificates themselves, had retained and carefully preserved the certificates as the appropriate and conclusive evidence of their right to the stock. The defendants can not set aside their own by-laws at their pleasure. The defendants, however, say, that the plaintiffs acquired only an equitable title to this stock, and that, though such a title will be recognized and protected within reasonable limits, yet that a duty devolved upon the plaintiffs themselves in the matter, which they have neglected, and by which neglect they have lost their right to the stock. This duty, they say, was, either to procure a transfer of the stock within a reasonable time, (which they say that four years clearly was not,) or else to give timely notice to the railroad company that the stock had been equitably assigned to them. They say that it is like the case of the grantee of real estate, who fails to get his deed recorded until after a *bona fide* purchaser has taken a later conveyance of the land, or of the vendee of personal property who does not take a delivery of it, and loses his title to it as against a *bona fide* purchaser who afterwards finds it in the possession of the vendor and buys and takes a delivery of it. They say that, admitting the stock to be genuine, so that the equitable title acquired from the Schuylers was a good one, and entitled them to a transfer of ninety shares of genuine stock if they had within a reasonable time demanded such transfer or given notice of their equitable title, yet that the Schuylers retained the legal power to sell this same stock to other parties, who would acquire a legal and therefore a preferable title if they should first get a transfer of it, and that it was the duty of the defendants to allow a transfer of whatever good stock they found standing in the name of the Schuylers, upon the presentation and surrender of a certificate for the same, so long as they had no notice of

any claim of other parties upon the stock; and that whatever claim the plaintiffs have for damages upon any body, is not a claim upon them, but, as in the case supposed of the vendee who had been defrauded by a later sale of the property by the vendor to another party, is a claim upon the Schuylers, their vendors, who have defrauded them; they, the defendants, being, as they say, merely custodians of the property, holding it subject to the order of the Schuylers, who were the owners of it, and having no other duty to perform than to see that the party calling for it had a proper order from the owners. We can not assent to this claim of the defendants. We can not regard them as mere custodians of the property, with no other duty with regard to it than that which has been suggested. By the very form of their certificates, specially prescribed, and specially adapted to the purpose of their negotiation, and which were issued by their own agent, and by their by-law providing that no stock represented by such a certificate should be transferred until the certificate itself was surrendered, they had assumed a duty far more extensive than that which they now assert. The *bona fide* holders of such certificates had a right to rely upon the certificates, under the circumstances, as securing to them the stock which they represented, against all transfers to other parties.

But there is a further, and we think decisive, reason why the defendants can not avail themselves of this transfer of the stock to other parties. These very transfers to other parties were a fraud upon the plaintiffs. This fraud is wholly distinct from the fraud of their transfer agent in issuing spurious certificates. The agent who issued the certificates might be a different person entirely from the agent who superintended the transfers, and it will make the point clearer to suppose him to have been so. Now their transfer agent knew, when he allowed these transfers to other parties, that the stock had already been sold to a prior purchaser, who held a legal certificate for it, and that it was a fraud on that party to allow the stock to be transferred to other parties, so long as the certificate was not surrendered. Their transfer agent, in allowing these transfers, was acting precisely within the scope of

his official power, and his knowledge and fraud are, therefore, the knowledge and fraud of the defendants themselves. We are supposing, in this view of the case, that the very stock in question has been transferred to other parties. This is the claim of the defendants, and we therefore, for the sake of the argument, so regard the fact. If the same stock was in fact transferred to other parties, then their transfer agent knew that he was committing a fraud on the plaintiffs in allowing the transfer, for he knew that the certificate representing that stock had not been surrendered, but was still outstanding in the hands of a *bona fide* purchaser. If, however, this precise stock was not transferred to other parties, but those transfers are to be regarded as operating on other stock, or as having no operation at all, then this stock is still left untransferred, and the defendants are clearly liable for having refused to allow a transfer of it to the plaintiffs. We are by no means sure that this latter supposition may not be a correct one. The subsequent transfers do not purport to embrace these shares, while Schuyler was constantly creating new shares, (or what purported to be such,) and transferring and re-transferring them, and issuing certificates for them, at his pleasure. These transfers and certificates may perhaps be regarded as having embraced only other stock, and as leaving the stock in question untransferred. We merely suggest this supposition, as it is not necessary to the general view of the case which we take.

But if the defendants are right in claiming that they are protected in transfers made to other parties where they have no notice of equitable transfers to prior purchasers, yet this principle very clearly could not avail them here. The plaintiffs, it is said, should have given them notice of their equitable title. But how should they have given such notice? Why, only to that officer of the company whose duties related to the transfer of their stock; that is, to their transfer agent, Robert Schuyler himself. But Robert Schuyler already had full knowledge of the fact, for he was the very party who sold the stock to the plaintiffs; and though a distinction may be made between the knowledge which he

had as an individual, in which capacity he was acting in selling the stock, and the official knowledge which he would have acquired by a formal notice given to him as transfer agent of the company, yet practically this distinction is very unimportant. When afterwards he came to allow the transfer of this stock to other parties, he was acting officially, and he then had knowledge, and acted with full knowledge, that the plaintiffs had acquired an equitable title to the stock. Notice of such an equitable title is never required to be formally given. Actual knowledge, however acquired, is enough to affect an individual, and we entertain no doubt that this knowledge of Robert Schuyler is to be regarded as the knowledge of their transfer agent, and as the knowledge of the defendants. It is to be observed, too, that Robert Schuyler was not merely the transfer agent of the defendants, but was at the same time the president of the company and one of its directors.

Two questions remain to be considered. One is, whether the plaintiffs have proved a sufficient demand upon the defendants for a transfer of the stock, to enable them to sustain their suit. That a demand was necessary is admitted by the plaintiffs. The first demand, made by the plaintiffs' cashier at the office of the company in New York, on the morning of July 5th, 1854, the day after the great fraud of Schuyler had been discovered, was not in our opinion sufficient. It appears that there was no transfer agent in the office, and that the company had appointed none in the place of Schuyler, who had just fled from the country, and the confusion incident to the developments then being made fully justified the defendants in temporarily closing their transfer books and in deferring the appointment of a new transfer agent. Such a course was necessary to the safety of the company, and was absolutely required by the condition of its affairs. As there was no absolute refusal to allow a transfer at some future time, we are inclined to the opinion that it was not such a refusal as to give the plaintiffs a right of action. The second demand, however, made by Mr. Buckingham in behalf of the plaintiffs, shortly before

the commencement of the present suit, we think was sufficient. It was made at a proper time and in a proper form, and it is expressly found that Mr. Buckingham, in making it, was acting as the agent and attorney of the plaintiffs. It is said by the defendants that Mr. Buckingham could not make a legal demand, because he had entered into a champertous, and therefore illegal and void contract with the plaintiffs for the prosecution of this claim, and that this demand was made under that contract, as a part of the service which he was to render in the prosecution of the claim, and for the purpose of bringing the suit. But we regard the demand as unaffected by the illegality of the contract for the prosecution of the suit. It preceded the institution of the suit and was not properly any part of it. He was none the less acting as the agent of the plaintiffs, and the plaintiffs have since ratified his act, if the authority given was defective before, by abandoning the champertous contract, assuming the benefit of the demand made by him, and proceeding with the suit on their own account. The question is purely one of authority, and we are satisfied that the authority was sufficient. It is a point of very little importance to these defendants, only at the most rendering another demand and suit necessary, and is too merely technical to deserve very much consideration. The defendants deny all right of the plaintiffs to a transfer of the stock, and upon any demand whatever would have refused to allow the transfer, and we should not, except upon a positive necessity, send the plaintiffs out of court to make another useless demand.

The remaining question is, whether the blank power of attorney given by R. & G. L. Schuyler to the plaintiffs, under seal, at the time they took the certificates, was sufficient, and whether the plaintiffs could afterwards fill it up and use it as a valid power, taking effect at the time it bears date. We think that it was sufficient, and that they could fill it up and use it, although it was under seal. We are satisfied that it has been the practice of this railroad company from the first, as it is of many other corporations, to their own great convenience and that of the public, to allow blank powers of

attorney to be filled up as circumstances should require; and such a practice may give a construction to, and may even qualify and vary, a by-law of a corporation. But without going so far as this, we feel no hesitation in holding the power to be sufficient in blank, and we are satisfied that in this country the rule of law is that a blank power of attorney, although under seal, may be filled up in conformity with the agreement of the parties, and when so filled up takes effect as of its date. The rule we suppose to be otherwise in England, where the old principle of the common law on the subject is more rigorously applied, and where the policy of the stamp system influences their decisions. The cases in this country in which the view taken by us is supported are numerous, and may be found in Redfield on Railways, sec. 35; and Mr. Redfield himself, a jurist of much learning and of long experience on the bench, gives it as his opinion that the doctrine of the American cases is decidedly preferable to that of the English. Nor can any reason be assigned, which is founded in good sense and is not entirely technical, why a blank in an instrument under seal may not be filled up by the party receiving it, after it is executed, as well as any other contract in writing, where the parties have so agreed at the time. In either case the contract, when the blank has been filled, expresses the exact agreement of the parties, and nothing but an extreme technical view, derived from the ancient law of England, can justify the making of any distinction between them. Such a technical distinction is little suited to the usages and necessities of modern commerce, for credit among merchants and facilities for making it available in their transactions are a most important element in its character, however unimportant they may have been in a state of society where commerce was little known, where seals were a substitute for signatures, and where lords and vassals alike could not write their own names.

We do not find it necessary to go out of the record to learn what course this railroad company has always pursued with regard to the transfers of their stock under powers of attorney. It is found that the certificates held by the plaintiffs

are in the form prescribed by the by-laws of the company, and are such as the defendants have uniformly sanctioned and approved. These certificates, as they came from the defendants' hands, contained, on the same piece of paper and immediately under the certificate, a blank assignment of the stock and a blank power of attorney for its transfer. The defendants must therefore be held to have intended and agreed, that whoever should present the certificate so issued, with the assignment and power of attorney executed in blank, should be entitled to fill up the blanks with his own name and to have a transfer of the stock made to himself on the books of the company. The certificate, accompanied by the assignment and power of attorney thus executed in blank, has perhaps a species of negotiability, although of a peculiar character, but one necessary to the public convenience, and to which it is no objection that the instrument has a seal.

But we feel relieved from embarrassment in holding this power sufficient, by the fact that the transfer was to be made under it in the state of New York, where, it is admitted by the defendants' counsel, the law is settled by the highest judicial authority in favor of the validity of a blank power of attorney. As the power was to be executed there, it is certainly sufficient that it was a valid one under the law prevailing there ; and a citizen from Connecticut, who has taken his certificate here, has certainly the same rights under it in New York that a citizen of that state would have under a certificate taken there.

We will only remark in conclusion, that the tendency of judicial decisions and of legislation in this country, is to do away, so far as can be done without too violent a departure from ancient rules, with distinctions in the character and effect of written instruments founded upon the mystical power of a seal. The legislature of this state has repeatedly, by confirmatory acts, enacted that instruments purporting to be specialties, but from which the seal had been omitted, should be as good and valid as if sealed, and has further enacted that the letters *L. S.* or the letter *S.* or some equivalent, in the place where a seal is ordinarily affixed, shall be

deemed to be a seal. Similar enactments we have no doubt are common in other states. In these circumstances we feel much more inclined to relax the strictness of the common law with regard to sealed instruments, than to adhere to it.

We have taken no notice of any security held by the plaintiffs, as affecting the amount of damages to be recovered, because no allusion was made to it in the argument. Independently of that, we advise the superior court to render judgment for the plaintiffs for the value of the stock in question at the time of the last demand, which is agreed to be sixty dollars per share, with interest from that date.

In this opinion the other judges concurred.

# SUPREME COURT OF ERRORS.

## LITCHFIELD COUNTY, OCTOBER TERM, 1861.

### Present,

HINMAN, C. J., ELLSWORTH AND BUTLER, JS.