[*General Term, October,* 1872.]

## R. W. LEE *v.* THE CITIZENS NATIONAL BANK OF PIQUA AND G. VOLNEY DORSEY.

A national banking association was organized under the act of Congress of 1864. In its *articles of association*, it provided that the bank might make by-laws, "to prohibit, if the directors shall so determine, the transfer of stock owned by any stockholder who may be liable to it, either as principal debtor or otherwise, without the consent of the board." It subsequently adopted a by-law, providing that "certificates of stock shall contain upon them *notice* of the provision, that no transfer of the stock shall be made without the consent of the board of directors by any stockholder indebted to it." It then adopted another by-law, providing that certificates of stock, signed by the president and cashier, may be issued to stockholders, and the certificate shall state upon the face thereof that the stock is transferable only on the books of the bank; and when stock is transferred, the certificates thereof shall be returned to the bank and canceled, and new certificates issued."

It then issued certificates of stock, which did not state that they were not transferable by the holder while liable to the bank, but which stated that they were "transferable only on the books of the bank, in person or by attorney, on the surrender of such certificates." And, upon the backs. thereof, were printed blank forms of assignment and power of attorney, *under seal*, for the holders to assign their stock.

The cashier of such bank, who was also a director, became the owner of a certificate for fifty shares of its stock, each share being for one hundred dollars He signed his name to the blank form of assignment and power of attorney, and delivered the same to a business firm, of which he was

Lee *v.* Citizens National Bank of Piqua, etc.

a member, to raise money upon for the use of such firm. The firm hypothecated it and delivered it to bankers, who loaned money upon the faith of it, they having no knowledge of the owner's liability to the bank, and no· notice of the requirements of its articles of association or by-laws. At the time of such pledging, the party to whom the certificate of stock was issued, was liable to his bank for a large sum of money. He *afterward,* being cashier and custodian of the bank's transfer books, transferred such stock on the books to the president of the bank, individually, but really in trust to secure the bank for his liabilities to it. The certificate was not returned, it being in the hands of his pledgees, and the transfer was made on the books without the knowledge of any one except such cashier; but it was afterward ratified, the president ·of the bank personally assumed all the liabilities of the cashier, and the bank thereupon transferred this stock to him upon its books, and has since paid him the dividends upon the same.

The bankers to whom the stock had been pledged, not being repaid their loan in full, sued the pledgor, said cashier, and recovered a judgment against him for between $1,500 and $1,600, upon which they caused execution to issue; and, to make their money, let the sheriff levy on the stock in their hands, they delivering it to him for the purpose, when it was further levied upon on two other executions in favor of the debtor's other general creditors. It was sold, like personal property, at sheriff's sale, without the pledgor's consent to either levy or sale, and another firm, knowing the terms upon which the pledgees held it, purchased it for $1,600, it being worth about par, which money they paid to the sheriff, who paid over to the original pledgees, who retained it in satisfaction of their debt, and, with their consent, the sheriff delivered the stock certificate, accompanied by a bill of sale, to the purchasers. They sold and delivered it to the plaintiff, who was one of their firm at the time of their purchase.

The certificate of stock was duly presented, by the purchasers, to the bank, and a transfer on the books to them duly demanded and refused, on the grounds aforesaid, and because the same stood transferred to the president of the bank as the owner, in person, thereof. The bank, being located in another county than that in which the suit was brought, voluntarily entered its appearance to the action in the county where suit was brought.

1. *Held,* that the act of Congress authorizing the organization of the bank and providing for its government, the articles of association, the rules and by-laws of the bank, and the act of issuing and *form* of the stock certificate must all be construed together; and while, in such cases, the bank's equity and rights are superior to those of the mere general creditors or stockholders, a person who receives such certificate from the holder, so indorsed in blank, in the usual course of business, for value, and without actual notice of the owner's liability to his bank, or of its rules and by-laws, acquires a right and property, in such stock, para-

mount to the equities of the bank, and, upon return of the certificate, may compel such bank to transfer such stock to him. Such stock is not negotiable paper, in the legal sense of the term, but the assignee's right is derived from the fact that the bank itself has put it in the power of its stockholder to raise money upon it, and must bear the loss as between it and an innocent purchaser, or pledgee.

2. In this case, this stock has never been transferred; the acts of the cashier and bank attempting to do so are void, the certificate of stock not having been returned as required by the rules of the bank, and that was notice to the bank of others' rights in the stock.

3. The owner of a certificate of stock, in the form of that in this case, may assign it and appoint an attorney *in blank*, though it be an instrument under seal.

4. Such stock can not be levied upon and sold on execution, and such attempted levy and sale are void, without the levy and sale were assented to by the owner of the certificate.

5. The holder of such stock in pledge, as collateral security for its owner's debt, is an agent of the latter, which agency is coupled with an interest in the pledge, and, like a trustee, he must account to his *cestui que trust* for the surplus remaining after the satisfaction of his interest, which imposes upon him the duty of guarding the interests of all parties as far as possible. He can only sell with the consent of the pledgor or after due notice to him, and if he do so, he will be liable for the sacrifice of others' interests.

6. Upon the facts of this case, the bankers holding the pledge have, in equity, *assigned* their debt and pledge to the plaintiff, who stands in their stead.

7. He can, therefore, not claim title to the entire stock, but only *a lien* upon it for $1,600, and interest upon that sum from the date of paying the money to the sheriff; therefore, he can not thus sacrifice $5,000 worth of stock for $1,600.

8. Section 57 of the national banking act, authorizing suits to be brought against such banks, in state courts, only in the counties of their location, is a mere personal privilege, which they may waive, and if they enter their appearance to suits brought in other counties, they give to the state courts full jurisdiction over them.

9. Where legal questions arise, dependent wholly upon the constitution of the United States or acts of Congress, and, in no way involving any state constitution or legislation, the decisions of the Supreme Court of the United States settling the construction of the same will be followed by the state courts, though they may have construed similar provisions in the constitution and statutes of their own states differently.

*Huston & Shunk*, for plaintiff.

*Matthews, Ramsey & Matthews*, for defendants.

YAPLE, J. This case comes before us for decision upon the law and facts, by reservation from Special Term.

The plaintiff, in his petition, alleges that the Piqua Bank is organized under what is known as the national banking act, passed June 3, 1864, and located at Piqua, Miami county, Ohio; that, on May 2, 1867, one Robert B. Moores, then a director, and the cashier of the bank, became the owner and holder of *fifty* shares of its capital stock, of one hundred dollars each, authenticated by the signature of the defendant, G. Volney Dorsey, as president, and Moores as cashier, with a blank form of indorsement and power of attorney, under seal, printed on the back thereof; that Robert B. Moores, the owner and holder of such certificate, afterward signed his name to such blank form of indorsement and power of attorney, and, before the 4th day of November, 1867, delivered the same to a trading firm of which he was a member, composed of himself and one Henry A. Perkins, for hypothecation, for the benefit of such firm; that, on the 4th day of November, the firm hypothecated the certificate by delivering it, so indorsed, as collateral security, to A. G. Burt & Co., bankers in the city of Cincinnati, in the usual course of business, for a loan of $3,000 to the firm, such stock having been, before that time, fully paid over to the bank by Moores; that part of such loan was repaid, and the balance being due, Burt & Co., on the 27th day of November, 1869, brought suit, in this court, against such firm, on its note given for such loan, and, at the February term, 1870, recovered a judgment, against Robert B. Moores (Perkins having been discharged in bankruptcy), for $1,556, with interest from January 3, 1870, and $11.10 costs; that, on April 21, 1870, Burt & Co. caused an execution to be issued on the judgment, which was levied upon such stock

in their hands, together with two other executions in
favor of general creditors of Moores, by the sheriff, and
which stock was, by that officer, sold, at sheriff's sale, on
May 5, 1870, to Adolph Wood &. Co., for the sum of
$1,600 (Moores not assenting to such levy and sale), and
the certificate, with a bill of sale, delivered to them, and
the money, after deducting costs, handed over to Burt &
Co., who received the same; that, on May 24, 1870,
Adolph Wood & Co., such owners and holders, presented
the certificate of stock and bill of sale to the bank, and de-
manded a transfer of the stock to them on the books of
the bank, which demand the cashier refused to comply
with, by order of the board of directors of the bank;
that Wood & Co. then sold and transferred the cer-
tificate to the plaintiff, who is the holder and owner .
thereof, but that the bank refuses to recognize him as such,
or to transfer the stock to him on its books; and that the
defendant, G. Volney Dorsey, the president of the bank,
claims to have some right or interest in the subject of the
litigation.

The plaintiff then prays the court to establish, by judg-
ment, his ownership of the stock, free from all claims or
alleged liens upon the same by the defendants; that the
bank be required to transfer the stock to him on its books,
and to account to him for all dividends since May 5, 1870,
and for alternative and general relief.

Upon the summons issued in the case, there is this in-
dorsement: "By virtue of express authority, we hereby
enter the appearance of the defendants. Matthews &
Ramsey." The bank has not answered, but is represented
in court by its attorneys.

Dorsey filed an answer and cross-petition, alleging that
he is the sole owner of the stock; that, on the 16th day of
January, 1868, he, being the president of the bank, received
from Robert B. Moores, then a director and the cashier of
the bank, and to whom such certificate of stock had been

issued, and in whose name it then stood upon the transfer books of the bank, a complete transfer of such stock, with certain other stock of Moores' to secure to the bank an indebtedness of said Moores to it, amounting to $23,500; that he, Dorsey, continued to hold such stock, subject to a lien thereon of the bank, for all Moores' indebtedness to it, until the 26th day of July, 1869, when he, Dorsey, gave his individual obligation to the bank for the then amount of Moores' indebtedness to it, amounting to $37,247.29, a large part of which he has since paid, and for the balance of which he is still bound to the bank; that, on August 9, 1869, the bank consented to and did transfer to him all its rights in all such stock; that, by the rules and by-laws of the bank, such certificates of stock are transferable only on the books of the bank by the stockholder in person or by attorney, each certificate containing a printed notice to that effect; that it was provided by section 15 of the by-laws of the bank, before, on, and ever since November 4, 1867, among other things, that the stock of the bank should be transferred only on the books of the company, and that no transfer should be made, without the consent of the board of directors, by any stockholder who should be liable to the bank, either as principal debtor or otherwise; and that from May 9, 1867, until after November 4, 1867, when Moores' stock was pledged to Burt & Co., Moores was liable to the bank in the sum of $8,500, which remained unpaid and was part of the liability assumed by him, Dorsey. He then prays that the plaintiff may be compelled to deliver up the certificate of stock to him, and that the same may be canceled.

The following is a copy of the certificate of stock and the indorsement in blank by Moores:

"The Citizens National Bank of Piqua, State of Ohio. No. 47.  50 shares. This is to certify that Robt. B. Moores is entitled to fifty shares, of one hundred dollars each, of the capital stock of the Citizens National Bank of Piqua,

transferable only on the books of the bank, in person or by attorney, on the surrender of this certificate."

"G. VOLNEY DORSEY, *President*.

"R. B. MOORES, *Cashier*.

"PIQUA, OHIO, *May* 2, 1867."

[25 cent revenue stamp.]

On the back:

"For value received, —— hereby sell, transfer, and assign to —— the shares of stock within mentioned, and authorize —— to make the necessary transfer on the books of the bank.

"Witness my hand and seal, this — day of ——, 186-.

[SEAL.]                              "ROBERT B. MOORES."

Witnessed by ——.

The by-law fifteen, referred to in the defendant's answer, provided *that certificates of stock shall contain upon them notice* of the provision that no transfer of the stock shall be made without the consent of the board of directors by any indebted stockholder.    This, this certificate does not contain.

It was issued under by-law sixteen, which provided that " certificates of stock, signed by the president and cashier, may be issued to stockholders, and the certificate shall state upon the face thereof, that the stock is transferable only upon the books of the bank; and when stock is transferred, *the certificates thereof shall be returned to the bank* and canceled, and new certificates issued."

Article six of *the articles of association* of this bank also provided that it might make by-laws to "*prohibit, if the directors shall so determine, the transfer of stock owned by any stockholder who may be liable to it, either as principal debtor or otherwise, without the consent of the board.*"

From May till after November 4, 1867, Robt. B. Moores was only liable to the bank in the sum of $8,500 with Dorsey, who is his father-in-law, as indorser, and in $2,000, for which he was indorser for a Mr. Moores; but, during all that time, he usually had a balance in his favor, upon the books of the bank, of between $6,000 and $7,000. He continued to be a director in and cashier of the bank for some

time after January 16, 1868, when the transfer of this stock was made to Dorsey on the books of the bank. Moores, being cashier, on January 16, 1868, without Dorsey's knowledge, transferred, on the bank's books, *all his right, title, and interest* to G. Volney Dorsey. To this, and other shares of stock, the word " trustee," after "Dorsey," was subsequently inserted, on the advice of counsel; but whether in Moores' presence or with his consent, does not expressly appear, though, it is presumed it was. Of course, the certificate of stock was not present or returned, and it was, at the time, without the assent of the board of directors. Since August 9, 1870, when the bank transferred all its rights in this stock to him, Dorsey has received the dividends upon it, viz: two and one-half per cent. semi-annually.

The evidence shows that when this stock was sold by the sheriff to Wood & Co., May 5, 1870, such stock was worth par, or seventy-five per cent. of its face at forced sale.

The bank, having given up all claims upon the stock, and accepted Dorsey as its debtor, the question of right to be determined is between the plaintiff and Dorsey.

Section 5 of the act of 1864, providing for the organization of national banks, requires articles of association, " which shall specify, in general terms, the object for which the association is formed, and may contain *any other* provisions, not inconsistent with the provisions of *this* act, which the association may see fit to adopt for the regulation of its business and the conduct of its affairs."

And section 8 provides that the " board of directors shall also have power to define and regulate, by by-laws not inconsistent with the provisions of *this* act, the manner in which its stock shall be transferred," etc.

Section 12 enacts that the capital stock of such banks shall be divided into shares of one hundred dollars each, be deemed personal property, and transferable on the books of the association, "*in such manner as may be prescribed in the by-laws or articles of association.*" But section 35 forbids such bank from making *any loan or discount*

*on the security of the shares of its own capital stock,"* and from becoming the purchaser or holder thereof, unless to prevent loss on a debt previously contracted in good faith, and then it must dispose of the same within six months.

Section 37 of the act of 1863 (12 Stat. at Large, 676) contained, substantially, the same provision as the present section 35 (13 Stat. at Large, 110); but section 36 of the act of 1863, repealed and supplied by section 12 of the act of 1864, above mentioned, expressly provided that "no shareholder, etc., shall have *power* to sell or transfer any share held in his own right, so long as he shall be liable, either as principal debtor, surety, or otherwise, to the association for any debt," etc. This restriction is repealed by the act of June 3, 1864, and entirely omitted from its provisions.

It will thus be observed that, under the act of 1863, such associations could not so draw their certificates of stock, or frame their articles of association, or by-laws, as to permit a stockholder to vest a paramount equitable right of property in them in innocent purchasers for value, while such stockholder should be indebted to the bank; but, under the act of 1864, this may be done; so, upon principle, the question in every case would be, whether the bank, in view of its articles of association, by-laws, and authorized form of certificates of stock, construed together, has or has not done so.

There have been adjudications upon these points under these acts. In the case of the *Bank* v. *Lanier,* 11 Wal. 369, the Supreme Court of the United States have held, that, where a stockholder in such a bank agrees with it that if it will, *in future,* deposit with him its funds at a bank of his in another city, it shall have a lien on his stock to secure such deposits, so *thereafter* to be made, and he does not deposit such stock with the bank, but keeps it, and assigns it for value to an innocent purchaser, such purchaser can hold it as against such bank. This decision is clearly correct, under the act of 1864, for a deposit is a loan, and the stat-

ute, section 35, forbids any loan upon the faith of, or pledge or deposit of its stock by or with such bank. And if the bank can not receive or hold its stock in pledge for future loans, it can acquire no lien therefor by mere agreement not accompanied by delivery. This case carefully distinguishes between such cases and those in which such banks endeavor to secure themselves for the *previous* indebtedness of stockholders, incurred independently of the credit of their stock.

In *Knight* v. *Old National Bank, etc.*, 4 Law Times Rep. 240, a stockholder, *previously* indebted to the bank, made an assignment of his stock for the benefit of his creditors; and his assignee claimed it for creditors generally against the bank, which, in its *articles of association*, forbid the valid transfer of such stock while the stockholder should be indebted to the bank, and the Circuit Court of the United States, Clifford, Justice, held that such assignee could not recover against the bank. The vital facts of this case were wholly different from those in the *Bank* v. *Lanier.* The debt was one contracted in the past; and the plaintiff was the mere assignee for the benefit of creditors. No third person's rights intervened. An assignee in bankruptcy, or under insolvent laws, acquires only the rights of his assignor: any claim in his hands is subject to all the equities of everybody, as it would have been in the hands of the debtor. Hence, it was as if the debtor himself had insisted that the bank should transfer his stock to his creditors generally. This rule of law is settled by the uniform and unbroken course of decisions, both in England and the United States. *Scott* v. *Surman*, Willes, 400; Ex parte Newhall, 2 Story, 360; *Mitchell* v. *Winslow*, Id. 630; *Ontario Bank* v. *Mumford*, 2 Barb. Ch. 596; *Strong* v. *Clawson*, 5 Gilm. (Ill.) 346; *Warden, etc.* v. *Gaylord & Son*, 14 Wal.

The confusion produced by this decision, and its apparent conflict with the *Bank* v. *Lanier*, simply arises from the fact that a wrong reason was given for the decision; for it is not at all in conflict with that case. In the *Bank of*

*Utica* v. *Manf. Bank*, 20 N. Y. 501, the court held that a bank could not pass such by-laws, because the act of its incorporation provided that it might do so in its *articles of association*, from which Justice Clifford inferred that a national bank may make such provisions in its articles of association, but not by a mere independent by-law; though, in the Lanier case, it was the illegality of the matter covered by the by-law that the court based the decision upon. In *Conklin* v. *Second Nat. Bank of Oswego*, 45 N. Y. 655, which was a case of the assignment by a stockholder of his stock for the benefit of creditors, though previously indebted to his bank, his stock certificate stating on its face that the stock " is not transferable until all liabilities of the stockholder to this bank are paid," the court held the transfer good as against the bank on the assumed authority of the Lanier case, decided by the Supreme Court of the United States. With all due respect, we hold that the question in the Lanier case was a wholly different one, and that this New York case was wrongly decided.

The next inquiry is, what is the law where such a banking corporation has provided in its articles of association and by-laws, that no stockholder shall assign or transfer his stock while indebted to the bank, such liability having been created previously, and not in any way upon the security of the stock itself, when the bank has adopted and issued to such stockholder a *form* of certificate entirely omitting reference to such restriction, and stating that no transfer is to be made on its books, except, on *return of the certificate* in person or by attorney, with a blank form of assignment and power of attorney printed on the back of such certificate; and such stockholder shall have signed his name to the blank assignment and power of attorney, and delivered the certificate upon sale or pledge to a third party, for value, which party has no other knowledge than what the certificate contains. Does such holder acquire an equity, paramount to that of the bank, created and reserved by its articles of association or by-laws? If so, it will add

great value to such stock by enabling its original takers to avail themselves of it as a basis of credit in the business world, and prevent them from virtually sinking so much of their means in the bank, and will greatly add to the kinds and amount of property the commercial world may base business transactions upon. It would obviously facilitate the organization of such banks, for men would then take stock, knowing that they did not withdaw so much of their property from furnishing them a basis of credit with the world. If this can not be done, all moneys invested in national bank stock is rendered useless to the owners as a basis of credit, whether they are indebted to their banks or not. For this the world can not know. The case of the *Bank* v. *Lanier* does decide that such a purchaser or pledgee from such stockholder, of such a certificate as was issued in this case, does acquire a paramount equity in the stock over the bank, and as against its articles of association or by-laws. See 11 Wal. 376–378.

But, it is here contended that this case is not correctly decided, and we are asked to hold the law to be different. The national banking act has nothing to do with state constitutions or laws. It depends entirely upon an act of Congress, and we feel it our duty to follow the construction given to that act by the Supreme Court of the United States, as that and all federal courts do to the decisions of the highest state courts upon questions depending wholly upon state constitutions and laws. Were our state courts to hold this question differently, the Supreme Court of the United States would review and annul such decisions. This is not a case where states have construed their reserved powers one way, and the United States another, and the question is presented, which is the ultimate judge of such reserved powers. The argument of counsel for the defendant, Dorsey, could only be properly urged for consideration in that class of cases.

The symmetry of the law, under so complex a system of government as we have, requires us to hold as we do in this

class of cases. But the decision of the Supreme Court of the United States but followed well considered decisions of state courts made upon the very point, and the correctness of which is expressly affirmed. We allude to cases growing out of the celebrated Schuyler frauds. See *N. Y. & N. H. R. R. Co.* v. *Schuyler*, 34 N. Y. 83–85; *Bridgeport Bank* v. *Same*, 30 Conn. 231. These cases decide that such a certificate can only be transferred on the books of the corporation by a return of the same, and if not so returned by the stockholder, that is *notice* to the company that he has parted with it to somebody, of the nature of whose rights it is bound to inquire before taking any action in the premises. And they clearly establish that by such valid transfer by the stockholder, without notice of his indebtedness to the bank, the stockholder's assignee acquires an equity paramount to the bank's. Also, that the stockholder's signature to the blank assignment and power of attorney, though under seal, is valid, and that such a certificate makes the stockholder *the agent* of the bank, and all whom it represents, to sell or pledge and pass title to such stock certificates. *Bridgeport Bank* v. *N. Y. & N. H. R. R. Co.*, 30 Conn. 231. These two cases gave the Supreme Court of the United States abundant authority for the decision in the Lanier case.

It is said that *Conant* v. *Seneca County Bank*, 1 Ohio St. 298, decides the very reverse. Not at all. Section 46 of the Ohio banking law, 43 Ohio L. 43, is almost word for word the provision contained in section 36 of the act of Congress of 1863, restricting the stockholder's *power* of transfer, which is not in the act of 1864, under which these transactions arose. See 1 Ohio St. 303.

*Pendergast* v. *Bank of Stockton*, 4 Law T. R. 247, decided by the Circuit Court of the United States for California, is not in point. In that case the person taking the stock from the stockholder *had full knowledge of the rule adopted by the bank, and of the stockholder's indebtedness to it.* See p. 252.

So we are clearly of the opinion that Burt & Co. acquired

a lien paramount to the rights of this bank by the transfer of this stock to him by Moores to secure the money loaned to his firm.    One of two innocent parties must suffer, and the bank, by drawing the certificate in the form it did, put it in Moores' power to injure the public, and must bear the loss.    The facts satisfy us that Moores intrusted it to his firm for that purpose, and took the benefit of the money raised upon its credit, and the New York and Connecticut cases above cited, as well as the case in 11 Wallace, establish that the bank could not transfer this stock on its books to anybody without its return, and that its non-production was notice to it of Burt & Co.'s rights.    In fact, Moores himself, the bank's cashier, and the man who had pledged it, undertook to transfer it without the consent of the board of directors of the bank.    For these reasons the stock has never been validly transferred to Dorsey.    The attempts to do so are void.    When transferred, new certificates must issue, and if that could be done without the surrender of the old, a double issue of stock would be the result.

It is next contended that the plaintiff has no title to this stock, because Burt & Co. surrendered it to the sheriff, who levied their execution upon it, under which it was sold, and that this relinquished their lien arising from the pledge to them, and plaintiff, through the sheriff's sale, acquired no other right to the stock than that of Robert B. Moores', to which the bank's rights were paramount.    We admit that such right of the bank, under its articles of association and its by-laws, was paramount to the rights of the general creditors of Moores.    *Whitaker* v. *Sumner*, 20 Pick. 399, decided by Shaw, C. J., is a leading case relied upon.    But before it can be considered as in point, we must determine whether the sheriff's levy and sale upon this execution were of any validity, whether they were not absolutely void, and the stock, therefore, never in the hands of the law at all.

The stock could not be levied upon and sold upon execution.    *Oystead* v. *Shed*, 12 Mass. 510; *Denton* v. *Livingston*, 9 Johns. 96; *Goodenow* v. *Duffield*, Wright, 456; *Haven* v.

*Wentworth*, 2 N. H. 93; *McClelland* v. *Hubbard*, 2 Blackf. 361; *Johnson* v. *Crawford*, 6 Ib. 377; *Buford* v. *Buford*, 1 Bibb, 306; *Thomas* v. *Thomas*, etc., 2 A. K. Marsh. 430; *Cosby* v. *Ross*, 3 J. J. Marsh. 291.

So the levy and sale upon execution are void, it not appearing that Robert B. Moores assented thereto. Burt & Co. could only have sold it through the law by proceedings on creditor's bill, or by proceeding in aid of execution, if no third party's rights intervened, or upon attachment, under our statute, against Moores. Now, upon the evidence, we are satisfied that Burt & Co. gave the certificate to the sheriff to make their money out of it by a sale; that when he had done so, they took the money from Wood & Co., who well knew the terms on which they held the stock, and assented to the transfer of the certificate to them, the sheriff being the agent of both parties, and this worked *an equitable assignment*, a thing well-known to the law, and differing from subrogation in the fact that the latter applies more properly to principal and surety, of all their interest in the stock, to wit: the amount of their judgment and costs, less the costs subsequent to the issuing of the execution to Wood & Co., who have transferred their rights to plaintiff, a member of the firm of Wood & Co. The amount due Burt & Co. on the judgment, on May 5, 1870, when Wood & Co. paid their money, was $1,599.38, or we may say, $1,600, the amount paid for the stock.

Burt & Co.'s possession of the stock was, and the plaintiff's is, the possession of an agent coupled with an interest. The stock could not be sacrificed by them while in their hands. In a proper way they could have realized their money from it, and for the balance they would have stood as trustees for other interested parties. They could not sacrifice the stock without rendering themselves liable for a breach of their trust. They did not sell it as the law requires in the case of a pledge or collateral security. See Story on Agency, §§ 489*a*, 488, 489, 496, and cases there cited.

The plaintiff can only claim $1,600, with interest from May 5, 1870.

We shall, therefore, adjudge and decree that the defendant, Dorsey, pay to the plaintiff the sum of $1,600, with interest from May 5, 1870, upon the payment of which, the plaintiff shall surrender to him this certificate of stock, and that the bank shall issue no certificate of stock to Dorsey or his assigns, in lieu of this certificate, for the amount included in this judgment, before Dorsey shall pay the same to the plaintiff, or allow dividends to him or them upon such amount.    It seems that section 57 of the banking act of 1864 only authorizes national banks to be sued in state courts in the counties or cities where located; but this, we hold, is a mere *personal privilege*, which may be waived, as this bank has expressly done in this case.

Judgment will be entered accordingly, each party to pay his own costs.